# NOTICE: SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 24, 2021

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 24, 2021

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In the Matter of the Dependency of | ) ) ) | No. 98554-5 |
| G.J.A., A.R.A., S.S.A., J.J.A., and V.A., | ) ) ) | EN BANC |
|  | ) | Filed: June 24, 2021 |
| Minor children. | ) |  |
| _____ | ) |  |

MONTOYA-LEWIS, J.—In 1978, Congress found "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children" and "that the States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."[1] 25 U.S.C. § 1901(3), (5). Through the Indian Child Welfare Act (ICWA), enacted by Congress in 1978, state courts and agencies are required to use "active efforts" to prevent the breakup of the Indian family. 25 U.S.C. § 1912(d). In 2016, the United States Department of the Interior, through the Bureau

_____

[1] We use the term "Indian" when referring to the statutory language contained in the Indian Child Welfare Act and Washington State Indian Child Welfare Act that uses that term. In all other areas, we use the term "Native."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of Indian Affairs (BIA), issued regulations stating, in part, that "[*a*]*ctive efforts* means *affirmative, active, thorough, and timely efforts.*" 25 C.F.R. § 23.2 (second emphasis added).

In 2020, in *McGirt v. Oklahoma*, Justice Gorsuch wrote on behalf of the United States Supreme Court, "On the far end of the Trail of Tears was a promise." ___ U.S. ___, 140 S. Ct. 2452, 2459, 207 L. Ed. 2d 985 (2020). That promise included the assurance of land for those tribes forcibly removed from their homelands to resettle, in community, with their traditions, customs, languages, and families intact. *Id.* While *McGirt* analyzes the importance of treaties with respect to land, its commitment to holding us to our promises instructs us in this case, which has at its core the promise to keep Indian families intact and to do so affirmatively. However, the systemic destruction of Indian families persists to this day, despite the promises and statutory frameworks set out in ICWA and its state counterparts. For example, in Whatcom County, where Native people make up 3.4 percent of the county's population,[2] Native children make up 16 percent of children in state dependencies.[3] Similar disproportionality exists throughout the state, even with the

---

[2] *QuickFacts, Whatcom County, Washington*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/whatcomcountywashington/PST045219 [https://perma.cc/S4QB-H6XY].

[3] WASH. STATE CTR. FOR COURT RESEARCH, DEPENDENT CHILDREN IN WASHINGTON STATE: CASE TIMELINES AND OUTCOMES 2020 REPORT C-151 (2021), https://www.courts.wa.gov/subsite/wsccr/docs/2020DTR.pdf [https://perma.cc/PZ6Z-52ZP] (Whatcom County Outcomes & Demographics). Note that while the report shows that 16 percent

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

ongoing training and work by the Department of Children, Youth, and Families

(Department) to reduce this disproportionality. To quote Lummi Nation tribal

member and former chairman Darrell Hillaire, "What about those promises?"[4]

Through the passage of ICWA and the Washington State Indian Child Welfare

Act (WICWA), Congress and the Washington State Legislature intended to redress

our nation's long-standing and widespread abusive practice of removing Native

children from their families and destroying Native communities. 25 U.S.C. §§ 1901-

1963; ch. 13.38 RCW. Among their many requirements, ICWA and WICWA

mandate that the State provide "active efforts" to prevent the breakup of Indian

families. 25 U.S.C. § 1912(d); RCW 13.38.130. Active efforts must be thorough,

timely, consistent, and culturally appropriate. 25 C.F.R. § 23.2; RCW

13.38.040(1)(a). The "active efforts" requirement is distinct from the "reasonable

efforts" requirement in non-Indian child custody cases because it requires both a

higher level of engagement from the Department and culturally appropriate services.

To ensure that the Department meets the minimum requirements of ICWA and

WICWA, every dependency court that oversees cases involving Indian families has

the responsibility to evaluate the Department's actions. WICWA requires the court

---

of children in dependencies in Whatcom County are Native, another 11 percent are identified by the State as multiracial American Indian/Alaskan Native. *Id.*
    [4] Children of the Setting Sun Productions, *What About Those Promises?*, YOUTUBE (Aug. 11, 2016), https://www.youtube.com/watch?v=vXTGMn5ytl4 [https://perma.cc/4M9X-DJKR] (play by Darrell Hillaire).

3

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

to conduct this evaluation at every hearing when the Indian child is placed out of the home, and the BIA recommends this at *every* hearing. RCW 13.38.040(1)(a)(ii); BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 43 (2016) (hereinafter BIA GUIDELINES). If the Department's actions fall below ICWA and WICWA standards, the court must order the Department to do more to comply with its statutorily imposed obligations before the case can proceed to termination.

ICWA and WICWA do not permit the application of the futility doctrine. The Department is not excused from providing active efforts unless it can demonstrate to the court it has made sufficient efforts and those efforts "have proved unsuccessful." 25 U.S.C. § 1912(d); RCW 13.38.130(1). The Department has the burden to provide active efforts, and it also has the burden to prove that those efforts were in fact unsuccessful before the matter can proceed to termination. A parent's action, inconsistency, or inaction does not excuse the Department from providing active efforts.

At issue in this case is whether the Department met its burden to provide active efforts to reunify C.A. with her children. We hold that the Department failed to provide active efforts when it provided untimely referrals and only passively engaged with C.A. from January through June 2019. We also hold that the dependency court impermissibly applied the futility doctrine when it speculated that

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

even had the Department acted more diligently, C.A. would not have been responsive. Therefore, we reverse the dependency court's finding that the Department satisfied the active efforts requirement from January through June 2019. We remand and direct the dependency court to order the Department to provide active efforts in accordance with this opinion before the court may proceed to hear the filed termination of parental rights petitions.

## I. FACTS AND PROCEDURAL HISTORY

C.A. is the mother of G.J.A., A.R.A., S.S.A., J.J.A., and V.A. All five children are affiliated with the Blackfeet Nation, and they are all Indian children for the purposes of ICWA and WICWA. In 2017, the dependency court found all five children dependent and removed them from C.A.'s care. The court identified C.A.'s parental deficiencies as "[s]ubstance abuse, mental health, parenting deficits caused in part by substance abuse and untreated mental health, inadequate supervision, maintains unhealthy relationships, [and] parenting skills to meet the needs of all the children." Clerk's Papers (CP) at 4. The court ordered the Department to provide the following services to C.A. to address those parental deficiencies: a parenting assessment, family therapy, a chemical dependency assessment, mental health treatment, pain management, and domestic violence services. The dependency court also ordered the Department to provide visitation and established a visitation schedule. The Blackfeet Nation intervened.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

C.A. asked the dependency court to find that the Department failed to provide active efforts from January through June 2019.[5]

The Department filed termination petitions for all five children on January 16, 2019. Jocelyn Seifert was the Department social worker who had been assigned to C.A.'s family's case in October 2018. She was based in Spokane, more than a two-hour drive from C.A. and her children, who were all located in the Tri-Cities.[6] On January 29, 2019, Seifert made her first attempt to contact C.A. since being assigned to the case when she tried to serve C.A. with the termination petitions. Seifert sent C.A. an e-mail and a text message, and she drove to the Tri-Cities to try to find C.A. but was unable to locate her. C.A. was in the hospital at the time, but she called Seifert back two days later on January 31, and they had their first conversation over the phone. C.A. explained she was doing well and asked for visitation to be arranged so she could see her children. They discussed the status of her court-ordered services, and Seifert assured C.A. that she would review them and get back to her.[7]

---

[5] C.A. acknowledged that she "hit rock bottom" and did not participate in services for a period in 2018. CP at 30. However, this appeal is concerned only with the specific time frame of January through June 2019. C.A. does not challenge the Department's efforts or the court's findings outside this time period. Therefore, her failure to participate in services in 2018 is not relevant here.

[6] The children were initially placed in three separate placements in three separate cities—the two oldest in foster placement in Spokane, the third oldest in foster placement in Mesa, and the two youngest with their maternal grandfather in the Tri-Cities. In 2019, the three older children were moved to foster placements in the Tri-Cities so they could be near their siblings. There is nothing in the record to indicate whether any of the foster placements were Native or whether the Department made any efforts to find Native placements.

[7] At this point in the dependency, C.A. had completed a number of court-ordered services on her own without any referrals or assistance from the Department. She completed two chemical

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

The next day, they briefly spoke over the phone again. Seifert arranged gas vouchers for C.A. to drive to Spokane and meet with Seifert. When C.A. picked up the gas vouchers at a Department office in the Tri-Cities, she was served with the termination petitions. Before she was scheduled to drive to Spokane, C.A. learned that Seifert had discussed an incident between C.A. and the children's father with a person C.A. was working for. C.A. felt that Seifert had betrayed her confidentiality by discussing her personal matters with someone else; she felt she could not trust Seifert and stated she no longer wished to speak with her. She did not travel to Spokane to meet with Seifert as they had planned, and—aside from one phone call *attempt*—Seifert did not try to contact C.A. again for over two months.

After this incident, C.A. communicated with Seifert primarily through her attorney. In early February, C.A.'s attorney e-mailed Seifert to again request visitations on C.A.'s behalf. Seifert did not respond, so C.A.'s attorney sent a follow-up e-mail the next week. When Seifert finally responded, she refused to set up visitations, saying, "There is not a visit referral at this time. We can discuss at court." CP at 38. She explained she would not set up visitations because of C.A.'s lack of engagement in late 2018[8] and because she was concerned that the visits with C.A.

---

dependency assessments and was on track to begin treatment. She also located a mental health provider on her own and was engaged in that service. She was also working with a pain management clinic to receive treatment, and she was working to access domestic violence services through her mental health provider.

[8] *See supra* note 5.

would harm the children. She said, "It's a delicate situation since we're going into a termination." *Id.* C.A.'s attorney pointed out that visitation was a court-ordered service and, absent a court order stating otherwise, the Department was required to provide it. A week later, an attorney for the Department responded to propose therapeutic visitations, meaning C.A.'s visits with her children would take place with a family therapist present. C.A.'s attorney pointed out that the Department had all the power, leaving C.A. with no choice—either she agree to the Department's proposal or she would not be allowed to see her children. When C.A.'s attorney expressed C.A.'s frustration that the Department was refusing to set up visits, Seifert stated, "It should also be noted that [C.A.] hasn't returned my calls. The last thing I heard from her is that she will not talk to me anymore." *Id.* at 88.

On March 7, 2019, the dependency court held a review hearing. C.A. acknowledged that she did not always have a working cell phone and this made communication more difficult, but she was doing all that she could to remain in contact.[9] The court reviewed the court-ordered services and noted that the

---

[9] At this time, C.A. had two primary phone numbers on file with the Department and her attorney—one was her mother's landline and the other was a cell phone that had limited functionality. C.A. asked Seifert to use the landline at her mother's house as her primary phone number because that was where C.A. lived during this time frame. If she was not home or if there was no answer, C.A. requested that Seifert leave a message. She also asked Seifert not to call the landline before noon due to her stepfather's work schedule. C.A. asked Seifert to list the landline on service referrals because it was her most reliable phone number. C.A.'s cell phone worked only when she was connected to Wi-Fi. C.A. had limited funds for phone calls on her cell phone, but she could check e-mails and texts when she was connected to Wi-Fi.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

Department needed to schedule visitations as well as provide referrals for family therapy and for a parenting assessment. The Department also filed a motion to modify visitations to a therapeutic setting. The court granted C.A.'s request for more time to respond to the Department's motion, but it temporarily ordered therapeutic visitations in the interim. That same day, Seifert confirmed C.A.'s contact information with C.A.'s attorney.

The day after the March hearing, Seifert located a family therapy provider and prepared a referral for family therapy, but she did not submit the form. Even though she had confirmed C.A.'s contact information with her attorney, Seifert was concerned that her contact information was unreliable and C.A. would not be responsive. She explained, "[U]nreachable clients create a significant burden on [the provider's] scheduling and staff resources." *Id.* at 54. She did not communicate this reason for withholding the referral to C.A. or her attorney.

In April 2019, C.A. was stranded in Spokane and needed assistance getting into a detox program, so she contacted Seifert for help. Seifert and another social worker drove to meet C.A. This was Seifert's only in-person meeting with C.A. during the entire time frame at issue in this case.

Seifert apparently did not refer C.A. to any detox facilities but simply provided her with gift cards for food and a list of local resources. C.A. asked for a ride, but Seifert declined, citing safety concerns. Over the following week, without

9

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

any assistance from Seifert, C.A. admitted herself into the hospital and completed a detox program. When she was released from the detox program, C.A. contacted Seifert for assistance finding a sober living facility. Seifert e-mailed and texted C.A. a list of housing options and a bus ticket back to the Tri-Cities. C.A. obtained a spot in a sober living facility but moved out after a few days because she was unable to afford rent. She also stated the environment was triggering and overwhelming because she had history with some of the other women in the house. To protect her safety and avoid a relapse, C.A. moved back in with her mother, who also lived in the Tri-Cities.

Seifert finally submitted the referral for family therapy on May 30, 2019— four months after they first spoke and C.A. had requested referrals. C.A.'s first session with the therapist occurred without the children. The provider informed C.A. that he did not usually work in family therapy. He also stated he would schedule therapy with only one child at a time for each weekly session, meaning C.A. would be able to engage in family therapy with each of her children only once every five weeks, at most. Nothing in the record suggests that this service was ever provided by a qualified family therapist. Nothing in the record indicates that this provider worked with Native children and families.

On June 6, 2019, the dependency court held a permanency planning hearing. C.A.'s attorney acknowledged C.A.'s difficulty communicating with Seifert, whose

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

office was located over two hours away.[10] Despite the barriers to regular means of communication, Seifert claimed she had had "consistent communication" with C.A. Verbatim Report of Proceedings (VRP) (June 6, 2019) at 33. The court again noted that C.A. had requested visitations but that the Department had not scheduled any. It also acknowledged that C.A. still needed a referral for a parenting assessment. In light of the pending termination hearing, the dependency court also advised C.A. to send daily e-mails to her attorney and Seifert to keep them apprised of her progress and needs. C.A. followed the court's suggestion and diligently sent daily e-mails to her attorney and Seifert. If she missed a day, she sent an e-mail the following day with an apology and a new update.

Seifert submitted the referral for a parenting assessment after the June hearing. Nothing in the record indicates if or when the parenting assessment ever occurred or whether it was performed by a qualified professional. Nothing in the record indicates that the provider worked with Native children and families.

---

[10] Seifert and C.A. lived hours apart and did not have any regular, in-person interactions. Their only in-person meeting occurred in April, when C.A. was in Spokane and contacted Seifert for assistance. C.A.'s primary phone numbers have remained the same throughout this time frame. Despite C.A.'s requests, Seifert at times called C.A.'s mother's landline before noon, called without leaving a message, or sent a text message to the landline. *See supra* note 9.

Aware that reliable methods of communication were a challenge, C.A. updated Seifert whenever she had new contact information. When she was able to use the children's father's cell phone, she contacted Seifert to provide her with that number as another method of communication. When C.A. eventually got a new cell phone, she also provided that number to Seifert, though she said it had poor service. Despite the fact that C.A. had multiple contact numbers, Seifert would call or text only one of these numbers at a time, and she did not always leave a message.

C.A. also had an e-mail address that did not change throughout this time frame. Her attorney confirmed this was their main method of communication.

11

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

C.A. filed a declaration to respond to the Department's motion to modify visitation on June 18, 2019. She stated she had been consistently engaged and requesting referrals since January 2019. She described at length her efforts to communicate with Seifert and explained that despite C.A.'s many requests, Seifert failed to make timely referrals for court-ordered services. She also explained how, even after many months of C.A. consistently requesting visitation, the Department still had not arranged any visits. C.A. requested the court find that the Department failed to provide active efforts to prevent the breakup of the Indian family under ICWA and WICWA.

On June 20, 2019, the dependency court held a hearing on the Department's motion to modify visitations to a therapeutic setting. It also considered C.A.'s declaration and request for a finding of lack of active efforts. The court noted that even though it had ordered therapeutic visitations in March, the Department still had not set up any visitations, therapeutic or otherwise. It also acknowledged the barriers to reliable communication and suggested the Department assist C.A. in obtaining a reliable, working phone.[11] The court ultimately affirmed the order amending visitations to occur in a therapeutic setting. The Department requested time to respond to C.A.'s declaration on the active efforts issue, which the court granted. At

---

[11] Nothing in the record suggests that the Department did anything to help C.A. obtain a working cell phone.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the hearing, Seifert again confirmed C.A.'s contact information. The next day, a different social worker for the Department submitted the referral for therapeutic visitations.

The family's first therapeutic visitation took place on July 10, 2019—over five months after Seifert and C.A. first spoke and C.A. had requested visitation. The professional who supervised the visit stated that he did not usually conduct therapeutic family visitation but explained he was temporarily filling in for the usual family therapist. Nothing in the record suggests that visitations were ever supervised by a qualified family therapist. Nothing in the record indicates that this provider worked with Native children and families.

Seifert filed a declaration in response to C.A.'s declaration regarding active efforts, where she detailed her efforts to communicate with C.A. and argued that the reason she delayed referrals was C.A.'s lack of consistent means of communication. Seifert stated, "The biggest barrier was [C.A.'s] ever-changing needs and lack of consistent contact information." CP at 64. She also argued that "[C.A.] also must bear responsibility" for their communication difficulties. *Id.* at 65. C.A. filed a declaration to reply to those assertions.

On August 1, 2019, the court held a hearing on the issue of whether the Department provided active efforts. C.A. argued that the Department failed to engage in active efforts to prevent the breakup of the Indian family as required by

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ICWA and WICWA. Active efforts, she argued, require more than simply providing referrals. She pointed out that several months had passed—with multiple hearings and court orders directing the Department to make referrals for court-ordered services—before the Department submitted those referrals. She argued that these untimely referrals and delayed visitations fell below the active efforts standard. She also argued that Seifert's inconsistent efforts to communicate with C.A. also fell below active efforts.

The Department admitted that Seifert's efforts were not "perfect" but argued that they met the active efforts standard. VRP (Aug. 1, 2019) at 83. It urged the dependency court to examine the entire scope of the dependency, as well as a previous dependency. It relied on Seifert's detailed communication log to argue that C.A. was not always responsive, and it also pointed out that C.A. had refused to speak with Seifert at one point in February 2019. The Department argued that C.A. and Seifert's inconsistent communication was the reason for the delay in referrals. It noted that Seifert admitted she could have done things differently, such as submitting the referral for family therapy in March or attempting to reach C.A. by calling and texting multiple numbers at a time. However, the Department argued, "[T]here's plenty of reason to believe that the phone was not going to be answered," even if Seifert tried multiple numbers. *Id.* at 87.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

The dependency court found that "from January 2019 to June 2019, the Department has provided active efforts to assist this family under ICWA and WICWA." CP at 164. In its written order, the court stated the "analysis of whether active efforts have been made is not solely focused on whether service referrals have been made." *Id*. However, the court was "not convinced anything would have come from the social worker clicking 'submit' on the family therapy referral she prepared in March[ ] 2019," believing that doing so would "knowingly set[] up the mother for likely failure." *Id.* at 164, 165. Still, the court stated that the reasons for not submitting referrals should have been communicated to C.A. The court also concluded that it "is not the court's role" to "critique how social workers could do better in every case." *Id.* at 165.

C.A. appealed the dependency court's order. The Court of Appeals denied her motion for discretionary review and denied her motion to modify that decision. The Supreme Court commissioner also denied her motion for discretionary review. We granted her motion to modify that ruling and granted review.[12]

---

[12] Four amici curiae briefs were filed in support of C.A. by the following organizations: Washington Defender Association and Fred T. Korematsu Center for Law and Equality; the National Indian Child Welfare Association, National Indian Justice Center, and Northwest Justice Project; University of Washington Tribal Court Public Defense Clinic and Legal Counsel for Youth and Children; and the ICWA Law Center and the Indian Law Clinic at Michigan State University College of Law.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

## II. ANALYSIS

### A.    Background of ICWA and WICWA

Since the founding of this nation and up through the early 1970s, the federal and state governments faced what they termed "the Indian problem."[13] They answered that issue with various policies that ranged from the genocide of Native people to the oft-stated educational practices of "Kill the Indian, and Save the Man"[14] through assimilationist and tribal termination policies. It was not until the early 1970s when then President Nixon announced a shift in federal policy toward government relationships with tribes and recognition of the critical importance of tribal sovereignty and tribal self-governance. By that time, the damage caused by the practice of removing Indian children from their families and tribes had been done—as we discussed in *In re Dependency of Z.J.G.*, in some states as many as a third of Native children had been removed from their families and communities. 196 Wn.2d

---

[13] The concept of the so-called "Indian problem" dominated early government policies and attitudes. *See* Nelson A. Miles, *The Indian Problem*, 128 N. AM. REV. 304 (1879); *see also* LEWIS MERIAM, INST. FOR GOV'T RESEARCH, THE PROBLEM OF INDIAN ADMINISTRATION (1928) (report commissioned by the Sec'y of the Interior); Karen M. Tani, *States' Rights, Welfare Rights, and the "Indian Problem": Negotiating Citizenship and Sovereignty, 1935-1954*, 33 L. & HIST. REV. 1 (2015). For other references to the "Indian problem" in the press, *see* Robert G. Hays, A RACE AT BAY: NEW YORK TIMES EDITORIALS ON "THE INDIAN PROBLEM," 1860-1900 (1997).

[14] Title of Captain Richard H. Pratt's 1892 speech to George Mason University in which he laid out his plan for educating Native children in residential boarding schools, a policy the federal government adopted and carried out from the 1890s through the 1950s. *"Kill the Indian, and Save the Man": Capt. Richard H. Pratt on the Education of Native Americans*, CARLISLE INDIAN SCH. DIGITAL RESOURCE CTR., http://carlisleindian.dickinson.edu/teach/kill-indian-and-save-man-capt-richard-h-pratt-education-native-americans [https://perma.cc/3QTG-X3HZ].

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

152, 165, 471 P.3d 853 (2020) (citing ICWA Proceedings, 81 Fed. Reg. 38,778, 38,780 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23)).

Congress enacted ICWA in response to concerted efforts by tribal leaders to redress our nation's long-standing abusive practice of removing Native children from their families and tribes. *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642, 133 S. Ct. 2552, 186 L. Ed. 2d 729 (2013). Congress found "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." 25 U.S.C. § 1901(3). It also noted "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 25 U.S.C. § 1901(4). Further, "an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." *Id.* These intrusive and destructive patterns have resulted in profound losses to Native communities, tribes, and Native children. "Congress recognized that, if it failed to act to protect the First Nations family unit, the historic genocide against the First Nations would continue via family separation." Rachel Johnson-Farias, *Uniquely Common: The Cruel Heritage of Separating Families of Color in the United States*, 14 HARV. L. & POL'Y REV. 531, 555 (2020). Therefore, Congress enacted minimum federal standards in an effort to stop the "'wholesale removal of Indian children from their homes'" by non-Native governments and to preserve tribal sovereignty and integrity. *Adoptive Couple*, 570

17

U.S. at 642 (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989)). ICWA set the *minimum* federal standards.

Similarly, the Washington State Legislature enacted WICWA "to remedy the historical and persistent state-sponsored destruction of Native families and communities." *Z.J.G.*, 196 Wn.2d at 157. WICWA was intended to "clarify[] existing laws and codify[] existing policies and practices," and it delineates "minimum requirements" to protect the rights of Indian families. RCW 13.38.030. ICWA and WICWA are intended to preserve tribal sovereignty. Allison Krause Elder, *"Indian" as a Political Classification: Reading the Tribe Back into the Indian Child Welfare Act*, 13 Nw. J.L. & Soc. Pol'y 417, 424 (2018) ("ICWA is not just about children and families, but also about tribal sovereignty and integrity."). Where ICWA and WICWA differ, the court applies the provision that offers greater protections to Indian families. 25 U.S.C. § 1921; *In re Adoption of T.A.W.*, 186 Wn.2d 828, 844, 383 P.3d 492 (2016). In applying both statutes, we recognize the statutes' intention to preserve tribal sovereignty and Native families.

States have "often reviewed cases involving Indian children according to Anglo, middle-class standards" and failed to "fairly consider the differing cultural and social norms in Indian communities and families." Megan Scanlon*, Comment, From Theory to Practice: Incorporating the "Active Efforts" Requirement in Indian Child Welfare Act Proceedings*, 43 Ariz. St. L.J. 629, 632, 633 (2011); *see also* H.R.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

REP. NO. 95-1386, at 10-11 (1978) (explaining how a lack of cultural competency is a driving force in the high rates of Native child removal). Forced removal and assimilation of Native children has damaged Native identities and cultures on an individual level as well as a tribal level. Therefore, ICWA and WICWA provide a number of heightened protections for Indian families, including clear notice provisions; tribal rights to intervention and exercise of jurisdiction; and heightened standards for removal, placement, and termination. *See generally* 25 U.S.C. §§ 1901-1963; ch. 13.38 RCW. In doing so, these statutes seek not only to disrupt these policies and practices but also to preserve and protect tribal life. *See* 25 U.S.C. § 1901(5); RCW 13.38.030.

These minimum standards require culturally appropriate engagement with the Indian family and deference to the tribe at each step of the dependency, including determination of Indian status, placement, and services. RCW 13.38.040(1), .050, .180. Again, these are *minimum requirements* and "do[] not prevent the [D]epartment from providing a higher standard of protection to the right of any Indian child, parent, Indian custodian, or Indian child's tribe." RCW 13.38.030. Throughout the dependency, the state agency is required to engage in active efforts to reunite the family. Those efforts and the requirements ICWA and WICWA impose must be viewed in the cultural and historical context briefly reviewed here and in this court's prior opinions addressing these statutes.

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

B. "Active Efforts" under ICWA and WICWA

On appeal, the issue of "[w]hether the Department has satisfied the 'active efforts' requirement is a mixed question of law and fact." *In re Dependency of A.L.K.*, 196 Wn.2d 686, 697, 478 P.3d 63 (2020). This court reviews the trial court's findings of fact for substantial evidence, but it reviews the legal question of whether the Department made active efforts in compliance with ICWA and WICWA de novo. *Id.*

### 1. The Department's Duty To Provide "Active Efforts"

Both ICWA and WICWA require the State to provide "active efforts" "designed to prevent the breakup of the Indian family." 25 U.S.C. § 1912(d); RCW 13.38.130(1). Key to "active efforts" is the Department's duty to actively engage the parent in a thorough, timely, consistent, and culturally appropriate manner to help reunify the Indian family if the conclusion of the dependency court is that the children must be removed from the care of their parent(s).

"Active efforts" has been considered the "'gold standard'" of child welfare. BIA GUIDELINES at 39. Under both ICWA and WICWA, heightened standards apply, and the "active efforts" requirement is one of the most important protections under ICWA and WICWA; it requires the state agency to engage with families to prevent termination of parental rights and the end of an Indian family. Active efforts that are thorough, timely, consistent, and culturally appropriate are the greatest hope to

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

preserve the Indian family. Proper and timely interventions are crucial to

reunification, and any delay in adequately engaging the parent or failure to do so in

a culturally appropriate manner only accelerates the destruction of the Native

family's cultural identity and ties to their community. The interventions of the state

agency must meet these standards.

> a. "Active Efforts" Must Be Thorough, Timely, Consistent, and Culturally Appropriate

ICWA defines "active efforts" as "affirmative, active, thorough, and timely

efforts intended primarily to maintain or reunite an Indian child with his or her

family." 25 C.F.R. § 23.2. Further,

> [w]here an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case and may include, for example:
> (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
> (2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
> (3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

21

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6) Taking steps to keep siblings together whenever possible;

(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11) Providing post-reunification services and monitoring.

*Id*. "By its plain and ordinary meaning, 'active' cannot be merely 'passive.'" BIA GUIDELINES at 40.

Similarly, WICWA defines "active efforts" as the Department's duty to "make timely and diligent efforts to provide or procure such services, including engaging the parent or parents or Indian custodian in reasonably available and culturally appropriate preventive, remedial, or rehabilitative services. This shall include those services offered by tribes and Indian organizations whenever possible." RCW 13.38.040(1)(a).

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

The purposes of ICWA and WICWA are, by nature, different from the purposes of the laws governing non-Indian child welfare cases. Barbara Ann Atwood, *Achieving Permanency for American Indian and Alaska Native Children: Lessons from Tribal Traditions*, 37 CAP. U. L. REV. 239, 249-50 (2008) ("Rather than placing an emphasis on permanency per se, ICWA instead emphasizes familial and tribal connections."). Therefore, the standard for providing active efforts to Indian families in child welfare cases is separate and distinct from the standard for providing "reasonable efforts" to non-Indian families. *See* ICWA Proceedings, 81 Fed. Reg. at 38,791 (explaining that active efforts and reasonable efforts "are used in separate laws and are subject to separate analyses"). *Compare, e.g.*, RCW 13.38.040(1)(a) (requiring "active efforts"), *with* RCW 13.34.138(2)(c)(i) (requiring "reasonable efforts"). The purpose of the active efforts standard is to "*prevent* the breakup of the Indian family." 25 U.S.C. § 1912(d) (emphasis added); RCW 13.38.130(1) (same). The Department cannot simply provide the same services in the same manner to Native families that it would to non-Native families. *See* Scanlon*, supra*, at 634-35 (discussing Congress's rejection of proposed language to require that services be "made available" to Indian families, instead requiring "active efforts"). The Department is required to engage the family "beyond simply providing referrals." RCW 13.38.040(1)(a). "By merely making services available, the legislation would not prevent the breakup of Indian families or thwart the placement

23

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

of Indian children with non-Indian families." Scanlon, *supra*, at 635. Rather, the Department is required to meaningfully engage with the Indian family, and the nature of the Department's required actions will vary greatly from case to case. BIA GUIDELINES at 39.

Under ICWA and WICWA, not only must the State provide higher levels of engagement, it must also "incorporate the varying cultural and social norms of Indian tribes and Indian families, rather than employ the same techniques that are otherwise provided in non-ICWA proceedings." Scanlon*, supra*, at 655. Culturally appropriate interventions and communication help "ensur[e] that an Indian child will know [their] culture and, as a result, that [their] culture will have a better chance of continued survival." Christine Basic, *An Overview of the Indian Child Welfare Act of 1978*, 16 J. CONTEMP. LEGAL ISSUES 345, 349 (2007). To help preserve Native culture and identity, the Department must engage "in partnership" with the Indian family, extended family, and tribe. 25 C.F.R. § 23.2; *see also* RCW 13.38.040(1)(a), .190(1).

In order to comply with ICWA and WICWA, the Department has the burden to provide "active efforts" that are—*at a minimum*—thorough, timely, consistent, and culturally appropriate. 25 U.S.C. § 1912(d); 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). The Department's actions must be thorough to "help[] the parents to overcome barriers, including actively assisting the parents in obtaining such

24

services," and the Department must "monitor[ the parents'] progress and participation in services." 25 C.F.R. § 23.2(2), (9). The Department cannot simply provide a referral and leave the parent to engage with providers and complete services on their own. RCW 13.38.040(1)(a); *In re Parental Rights of D.J.S.*, 12 Wn. App. 2d 1, 36-37, 456 P.3d 820 (2020) (concluding that the Department did not engage in active efforts when it simply met with the parent to review services and provided instructions on how to obtain a phone, housing, and counseling, but did not accompany the parent and help them complete applications to ensure they actually obtained services). "Active efforts" must be specifically "tailored to the facts and circumstances of the case," and the Department must act diligently to address a parent's particular needs. 25 C.F.R. § 23.2.

The timeliness requirement for the Department's actions is not limited to referrals for court-ordered services but must encompass all services necessary to reunite the Indian family. The Department must also be consistent in its provision of active efforts throughout the dependency, and it is not relieved of its duty to provide active efforts simply because it made sufficient efforts at another time during the dependency. *A.L.K.*, 196 Wn.2d at 701-02 (rejecting the Department's argument that because it previously found the Department had provided active efforts, the court should find active efforts overall).

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

Finally, "active efforts" must be culturally appropriate and support the Native family's cultural roots. "To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe." 25 C.F.R. § 23.2; *see also* RCW 13.38.040(1)(a) (requiring "culturally appropriate preventive, remedial, or rehabilitative services"). Social workers have often misunderstood "the ways of Indian family life," "the dynamics of Indian extended families," and "Indian child-rearing practices"; "ignorant of Indian cultural values and social norms," they have broken up Indian families without justification. *Indian Child Welfare Program: Hearings Before the Subcomm. on Indian Affairs of the S. Comm. on Interior and Insular Affairs*, 93d Cong., 18-19 (1974), https://www.narf.org/nill/documents/icwa/federal/lh/hear040874/hear040874.pdf [https://perma.cc/Z6HJ-TNGE] (hereinafter *1974 Senate Hearings*) (statement of William Byler, Exec. Dir., Ass'n on Am. Indian Affairs). The Department is less likely to destroy the Native family's cultural connections when it engages with the family in a culturally appropriate manner and provides services that are connected to the Native family's values and beliefs. ANGELIQUE DAY & ANGELINA CALLIS, UNIV. OF WASH. SCH. OF SOC. WORK, EVIDENCE-BASED TRIBAL CHILD WELFARE PREVENTION PROGRAMS IN WASHINGTON STATE: A SYSTEMATIC REVIEW 4 (2020),

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

https://www.dcyf.wa.gov/sites/default/files/pdf/reports/TribalCWPrevention2020.pdf [https://perma.cc/DZT2-7CXT].

Further, the Department must document its provision of active efforts in the record. 25 C.F.R. § 23.120(b); BIA GUIDELINES at 44. This includes, but is not limited to, information regarding

- The issues the family is facing that the State agency is targeting with the active efforts (these should be the same issues that are threatening the breakup of the Indian family or preventing reunification);
- A list of active efforts the State agency determines would best address the issues and the reasoning for choosing those specific active efforts;
- Dates, persons contacted, and other details evidencing how the State agency provided active efforts;
- Results of the active efforts provided and, where the results were less than satisfactory, whether the State agency adjusted the active efforts to better address the issues.

BIA GUIDELINES at 44. It is the Department's responsibility to clearly document its actions in the record to enable the court to reach an informed conclusion about the Department's provision of active efforts.

b. The Department Failed To Provide "Active Efforts"

Here, the Department failed to provide active efforts to prevent the breakup of C.A.'s family from January through June 2019.[15] The Department is required to,

---

[15] The Department argues that C.A.'s appeal is moot because the court found the Department made active efforts before and after the time period at issue here and C.A. does not challenge those findings. However, whether the Department made active efforts during other time periods is not dispositive to its obligation during this time period. *A.L.K.*, 196 Wn.2d at 701-02.

27

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

"[*a*]*t a minimum*," demonstrate that it "actively worked with the parent . . . to engage them in remedial services and rehabilitation programs to prevent the breakup of the family *beyond simply providing referrals to such services.*" RCW 13.38.040(1)(a) (emphasis added). The Department did little more than provide referrals for court-ordered services, and even then, the referrals were untimely and inadequate. *See In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 875, 439 P.3d 694 (2019) (concluding the Department had failed to make active efforts when it did not timely provide referrals). Beginning in January 2019, C.A. and her attorney consistently requested visitations and referrals. During two separate interim hearings, the dependency court noted the Department needed to provide referrals and set up visitations. Yet, the Department did not make any referrals for visitations and prevented C.A. from seeing her children for over five months. Even when the Department made the referrals for services, it engaged professionals for therapeutic visitation and family therapy who did not typically provide those services. Nothing in the record suggests that those professionals had experience working with Native families or that the Department made any efforts to procure such services.

---

Further, because the Department is required to provide consistent active efforts and the dependency court is required to review the Department's actions at every hearing where the child is placed out of the home, a prior finding of active efforts does not alleviate the Department's burden at any other point in a dependency.

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The Department's untimely and inadequate referrals do not meet the minimum ICWA and WICWA requirements for "active efforts." WICWA specifically notes that solely providing referrals falls below the legal standard. Simply providing referrals and expecting a parent to take the next steps to access services demonstrates a failure to recognize why we hold the Department to a higher standard when working with Native families. As noted earlier, ICWA and WICWA's active efforts standard is often described as the "gold standard" in child welfare—this kind of social work in dependency cases should be the norm for *all* families in crisis. In cases involving Native families, it is required. It is required as a direct result of the state and federal governments' active engagement in attempting to destroy these families. When destruction of Native families has been the norm, an active and engaged process to ensure that this no longer occurs is the bare minimum, and, here, it is the legal minimum.

The Department also failed to meaningfully engage with C.A. to address her treatment and recovery needs. The Department is required to "[i]dentify[] community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and *actively assist*[] the Indian child's parents . . . in utilizing and accessing those resources." 25 C.F.R. § 23.2(8) (emphasis added). When C.A. was in Spokane—over two hours away from her home—she reached out to Seifert to ask for assistance obtaining services specific to her addiction

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

recovery. This was their only in-person interaction during the entire time frame at issue in this case. Seifert merely provided C.A. with a gift card, a bus pass, and general information about local services. Nothing suggests that Seifert actually provided C.A. with any referrals to detox facilities, but even if she had, a passive referral alone would have been insufficient. RCW 13.38.040(1)(a) (active efforts requires engagement "beyond simply providing referrals"). Seifert failed to provide active efforts when she left C.A. to arrange her treatment—while at a critical juncture, no less—when she should have actively assisted C.A. with getting the medical treatment she needed. *See A.L.K.*, 196 Wn.2d at 701 (explaining that the social worker should have driven the parent to services and assisted her with filling out forms and applications); *see also D.J.S.*, 12 Wn. App. 2d at 36-37 (explaining that the social worker should have taken the parent to the facility and helped him fill out paper work, rather than leaving him to find housing himself); *A.L.C.*, 8 Wn. App. 2d at 875 (faulting the Department for being aware of the parent's housing needs but making no effort to assist the parent in identifying, utilizing, or accessing services).

The actions of the Department while C.A. lived in the Tri-Cities and the implication that C.A. lived at a distance too far for the Department to easily provide services to C.A. are undercut by the time C.A. was in Spokane. C.A.'s treatment and recovery period in Spokane was the only time that they were in the same city, yet Seifert did not follow up or check on C.A. in person by visiting her at the hospital or

30

the detox facility, nor did she accompany C.A. to the bus stop when she returned to the Tri-Cities. *See* 25 C.F.R. § 23.2(8) ([T]he Department is required to "[i]dentify[] community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assist[] the Indian child's parents . . . in utilizing and accessing those resources."); 25 C.F.R. § 23.2(9) (The Department is responsible for "[m]onitoring progress and participation in services."). During the two-week period when C.A. was in treatment in Spokane, Seifert initiated contact with C.A. only once—when she texted C.A. to discuss an upcoming meeting regarding two of her children's placement, *not* to check on her health, safety, or needs. Seifert did not monitor C.A.'s progress in the detox program, despite the fact that the dependency court had identified substance abuse as a parental deficiency and ordered a chemical dependency assessment. Seifert should have actively assisted C.A. in accessing the treatment she needed and, at the very least, consistently reached out in any capacity. But she did not even text or call C.A. to check on her or help her. Rather, the burden fell to C.A. to contact Seifert to request the services she needed. After C.A. requested help finding sober housing, Seifert texted and e-mailed her a list of sober housing facilities. Instead of actively assisting C.A. in accessing necessary housing, Seifert left her to contact the sober housing facilities on her own. Seifert did not follow up with C.A. to confirm she was in safe, sober housing. Rather, it was C.A. who reached out to Seifert to inform her

31

that she was unable to afford the rent and that it was unsafe for her to stay there. Seifert's failure to actively assist C.A. in getting admitted into a detox program or accessing safe, affordable, sober housing and her failure to monitor C.A.'s progress fell far below the minimum "active efforts" requirement.

The Department is also tasked with "helping the parents to overcome barriers." 25 C.F.R. § 23.2(2). This is not limited to court-ordered services, and must necessarily encompass *all* barriers to reunification. C.A. had some barriers to reliable communication, but Seifert made no effort to help C.A. overcome those barriers. Seifert never took steps to help C.A. obtain a working phone, despite the fact that doing so is a frequent part of the Department's services to parents. Rather, Seifert treated those communication barriers as a reason to withhold referrals and as an excuse for her own failure to stay in touch with C.A.

Seifert's efforts to communicate with C.A. were inconsistent and lacking. C.A. had multiple phone numbers, yet Seifert made minimal efforts to reach C.A. by calling or texting only one number at a time. C.A.'s primary cell phone worked only when connected to Wi-Fi, her other cell phone had poor service, and a third cell phone belonged to her children's father, so it is unsurprising that C.A. could not answer every single phone call on each of these numbers. C.A. repeatedly asked Seifert to use her mother's landline as her primary contact and requested that Seifert call the landline after noon and, if C.A. was not there, leave a message. However,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Seifert on occasion called the landline before noon or did not leave a message; she also sent text messages to the landline. Seifert's call logs indicate that she sporadically called C.A., sometimes calling one phone number only once in a whole month. At times, weeks or months passed with no attempt whatsoever to contact C.A.

Minimal and inconsistent efforts to communicate with a parent such as these do not suffice under ICWA and WICWA, which require the Department to make active efforts to help parents overcome barriers like communication. 25 C.F.R. § 23.2(2). C.A. repeatedly demonstrated that she was reachable by various means, yet Seifert's efforts to reach her could hardly be described as exhaustive. In fact, Seifert conceded she could have done more to communicate with C.A. by e-mailing, calling regularly, or attempting multiple numbers at a time. Seifert did not use e-mail as their primary method of communication, even though C.A. and her attorney exchanged e-mails with no apparent issue. It is also worth noting that C.A. appeared by phone at all but one of the hearings contained in the record; she was unable to call in for only one hearing, but she communicated with her attorney shortly after. Seifert could have worked with C.A. to establish a schedule to regularly check in on the phone. The court also suggested the Department could provide C.A. with a new cell phone, but the Department apparently took no steps to do so. Seifert failed to actively work to overcome communication barriers.

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Further, rather than meaningfully working to develop a solution to these communication barriers, the Department used C.A.'s lack of reliable communication against her. Seifert completed a referral for family therapy in March 2019 but did not submit it; she withheld the referral because she believed C.A. was unreliable. Instead of actively working with C.A. to make communication easier, Seifert blamed C.A. for not responding to every call and text. In her declaration, Seifert stated, "The biggest barrier was [C.A.'s] ever-changing needs and lack of consistent contact information," and she argued that "[C.A.] also must bear responsibility." CP at 64, 65. However, the Department bears the burden to meaningfully and actively engage the parent. C.A.'s lack of reliable communication and stable housing were conditions of her circumstances, and the Department is not permitted to use a parent's poverty or circumstances as an excuse to avoid providing active efforts. *See 1974 Senate Hearings* at 1 (statement of Sen. James Abourezk (explaining that poverty is not a reason to take Indian children away from their families)).

In contrast, C.A. made tremendous efforts to identify and access services on her own and to communicate with Seifert, even though she was not required to do so. After reaching out in April, C.A. regularly contacted Seifert to keep her updated regarding her treatment, needs, and living situation. C.A. went to great lengths to keep Seifert apprised of her situation and the best methods to contact her. She also updated Seifert whenever she had a new contact number. After the June hearing,

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

C.A. sent daily e-mails to her attorney and Seifert to inform them of her progress and needs. Under ICWA and WICWA, C.A. had no burden to engage the Department. C.A.'s actions demonstrate her significant efforts to communicate with Seifert and to work with her to engage in services—even when Seifert made minimal effort. Under ICWA and WICWA, the Department bears the responsibility to provide active efforts to reunify the Indian family. *A parent's extraordinary efforts do not relieve the Department of its duty to provide active efforts and actively engage the parent in accessing and utilizing necessary services.*

The Department is also required to provide culturally appropriate services in accordance with the tribe or the children's extended Native family members. *See* 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). Active efforts must be "consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe." 25 C.F.R. § 23.2. Again, this is the Department's burden, and the Department must document its actions on the record. 25 C.F.R. § 23.120(b). The record here is completely lacking of any evidence regarding culturally appropriate services. Based on the record before us and the Department's level of engagement, one would think the children were not Native and that ICWA and WICWA did not apply to these dependencies. The record contains no information as to any efforts to place the children in accordance with Native placement preferences as required by law; therefore, we do not know whether any of the foster placements for the children were

35

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

Native, *see supra* note 6, or whether there were any efforts to engage with the children's tribe or Native family members regarding placement. *See* 25 U.S.C. § 1915; RCW 13.38.180. The record also contains no information as to any efforts to procure services that are connected to and support the family's Native values and beliefs. *See* 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). We do not know whether any of the professionals the Department engaged for court-ordered services were competent to provide culturally appropriate services to Native families. There is nothing in the record to indicate the Department's efforts to engage with the Blackfeet Nation, aside from the social worker's declaration stating that the tribe had not been responsive.

It is critical to note here that "in practice tribes often do not have the skills or resources needed" to actively participate in child welfare cases. Andrea V.W. Wan, *The Indian Child Welfare Act and Iñupiat Customs: A Case Study of Conflicting Values, with Suggestions for Change*, 21 ALASKA L. REV. 43, 46 (2004). The tribe's lack of response does not relieve the Department of its responsibility to engage the parent in culturally appropriate services. It is a common concern of state courts that tribal intervention and participation in ICWA/WICWA cases is limited, despite proper notice to the children's tribe. It is not uncommon for a tribe to wait to step in until termination petitions have been filed. This is a result of the reality that tribal attorneys' offices and child welfare staff have no consistent source of financial

36

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

stability. Tribal resources are extremely limited, and if a tribe seeks to provide child welfare or attorney services, doing so must come from grant funding or tribal coffers. While some tribes have been very successful in their economic development, others have not, due to location, natural resources, and staffing. As a result, tribes will often prioritize their limited resources, and in child welfare cases that may mean not actively engaging in a case involving their children and families until the destruction of that family is imminent. That may be a frustration of the Department and state courts, but it is, again, a function of history, and recent history at that. Therefore, a tribe's lack of response or involvement in a dependency *cannot* be a reason to relieve the Department or the court of its responsibilities. Rather, it is an additional reason for the existence of the heightened standards of ICWA and WICWA.

The Department is also not excused from this responsibility to provide culturally appropriate services because the parent did not self-identify specific services.[16] The burden to provide active efforts belongs to the Department, not the parent. Nothing in the record demonstrates whether the Department made any efforts

---

[16] In *D.J.S.*, the Court of Appeals held that the Department was not required to provide services tailored to the parent's Native background because the court did not order any such services and also because the parent had not provided testimony about any specific needs based on his Native heritage. 12 Wn. App. 2d at 22-23. This is inconsistent with ICWA and WICWA; culturally appropriate services are *always* inherently necessary. 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). Therefore, we overturn *D.J.S.* to the extent that it held that the Department is required to provide culturally appropriate services only when the court orders them or a parent self-identifies special needs based on Native heritage.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to work with the tribe or actively engage with C.A. and her children in a manner that was culturally appropriate.

The Department failed to meet its burden to provide active efforts when it simply provided untimely and inadequate referrals to services that were not culturally appropriate. It also failed to engage with C.A. to overcome other barriers, including communication, housing, and treatment. Instead, the Department used those barriers against her and relied on them as excuses to not reach out to C.A. or submit referrals. The Department's actions fell far short of the minimum standards of ICWA and WICWA.

### 2. *The Dependency Court's Role*

State agencies and courts have both contributed to the destruction of Native communities. Scanlon*, supra*, at 645 ("Congress perceived the states and their courts as part of the problem it intended to correct with the passage of the ICWA"). "[S]tate courts historically had found parental neglect by Indian parents through a biased lens and without an adequate evidentiary foundation." Atwood, *supra*, at 249; *see also* H.R. REP. NO. 95-1386, at 11 (1978) ("The abusive actions of social workers would largely be nullified if more judges were themselves knowledgeable about Indian life.").

In order to account for the court's role in the historic destruction of Native communities, ICWA and WICWA also impose a duty on the dependency court.

38

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

While the Department bears the burden to provide active efforts, ICWA and WICWA require the dependency court to regularly inquire about and evaluate the Department's provision of active efforts. 25 U.S.C. § 1912(d) (requiring that the State "shall satisfy the court that active efforts have been made"); RCW 13.38.130(1) (same); RCW 13.38.040(1)(a)(ii) (requiring that the State "must show to the court that it has actively worked with the parent"). Further, as with other requirements, the court's evaluation of the Department's provision of active efforts "must be documented in detail in the record." 25 C.F.R. § 23.120(b); *see also* BIA GUIDELINES at 44 ("The active-efforts requirement is a key protection provided by ICWA, and it is important that compliance with the requirement is documented in the court record."). Therefore, the dependency court has a duty to ensure that the standards of ICWA and WICWA are being met and that the Department is satisfying its burden to provide active efforts.

> a.   The Futility Doctrine Is Inapplicable to Child Welfare Cases Involving Indian Children

The law under ICWA and WICWA is distinct and separate from the law that applies in non-Native child welfare cases. In all cases involving Indian families, the Department "shall satisfy the court that *active efforts* have been made . . . and that these efforts *have proved unsuccessful*." 25 U.S.C. § 1912(d) (emphasis added); RCW 13.38.130(1); *cf.* RCW 13.34.025(2) (in non-ICWA/WICWA cases, requiring the Department to provide "*access*" to services capable of correcting parental

39

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

deficiencies "*in the foreseeable future*" (emphasis added)). In cases involving non-Indian families, the judicially created futility doctrine may excuse the Department from providing services if the services would have been futile or would not remedy the parental deficiencies within the child's foreseeable future. *In re Welfare of Hall*, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983). The futility doctrine is speculative, and such speculation is not permitted under the plain language of ICWA and WICWA. 25 U.S.C. § 1912(d) (the Department must demonstrate that active efforts "have proved unsuccessful"); RCW 13.38.130(1) (same). ICWA and WICWA focus on the Department's actions to engage in active efforts; the Department has the burden to provide active efforts (as well as meet the heightened standards of proof laid out in both ICWA and WICWA), and it also has the burden to prove its efforts were *in fact* unsuccessful before it can be relieved of its duty.

A parent's inability or unwillingness to engage with the Department may be attributed to many factors, such as cultural differences, poverty, or generational trauma. It may also be related to the reasons for the dependency petition and ensuing case. Excusing the Department's burden to engage in active efforts based on a parent's lack of engagement would impermissibly harm Native families who are experiencing poverty or other issues that often fall under the rubric of "neglect." While poverty alone is not a sufficient basis for dependency or termination, it has historically been used as justification to remove Native children: "Poverty, poor

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

housing, lack of modern plumbing, and overcrowding are often cited by social workers as proof of parental neglect and are used as grounds for beginning custody proceedings." *1974 Senate Hearings* at 19 (statement of Byler). "Ironically, tribes that were forced onto reservations at gunpoint and prohibited from leaving without a permit, are now being told that they live in a place unfit for raising their children." *Id.* at 20. "[C]ommunity or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, [or] substance abuse," without "a causal relationship" between the conditions and the likelihood of serious emotional and physical damage to the child, do not justify State intrusion into the Native family. 25 C.F.R. § 23.121(d).

Also, disproportionately high levels of poverty in Native communities often create barriers to engagement. *See* WASH. STATE DEP'T OF HEALTH, SOCIOECONOMIC POSITION IN WASHINGTON 2 (2016), https://www.doh.wa.gov/Portals/1/Documents/1500/Context-SEP2016-DU.pdf [https://perma.co/6D8C-8NMK] (Dec. 19, 2016 data update of the chapter in HEALTH OF WASHINGTON STATE (2014)). For example, lack of reliable transportation or reliable methods of communication may make it difficult for a parent to communicate with the Department and providers or to engage in services. Housing instability also impedes a parent's ability to engage; that instability is also often improperly used as a reason to not reunify families. Further, a parent

41

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

experiencing housing instability will necessarily have to spend time and energy securing a safe place to sleep each night, and the stress and trauma of that effort will often impair their ability to complete other tasks. Carmela J. DeCandia & Kathleen Guarino, *Trauma-Informed Care: An Ecological Response*, 25 J. CHILD & YOUTH CARE WORK 7 (2015). Additionally, housing instability can increase the risk of intimate partner violence because housing-insecure people are often forced to stay with abusive partners when they are unable to afford housing on their own. *See generally* Amber Clough et al., *"Having Housing Made Everything Else Possible": Affordable, Safe and Stable Housing for Women Survivors of Violence*, 13 QUALITATIVE SOC. WORK 671 (2014). "Because of poverty and discrimination Indian families face many difficulties, but there is no reason or justification for believing that these problems make Indian parents unfit to raise their children." *1974 Senate Hearings* at 1 (opening statement of Sen. James Abourezk). The Department is required to actively assist a parent in overcoming these barriers, and the court cannot rely on these barriers to excuse the Department's responsibility. 25 C.F.R § 23.2.

In addition, generational trauma has instilled a deep sense of distrust of government workers in Native communities. The child welfare system often "view[s] parents as solely responsible for their challenges" and is often "frustrat[ed] with families' perceived lack of commitment or willingness to do what it takes to

42

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

get their kids back." Sheri Freemont, *Gold Standard Lawyering for Child Welfare System-Involved Families: Anti-Racism, Compassion, and Humility*, 42 THE GUARDIAN 1, 1-2 (2020), https://cdn.ymaws.com/www.naccchildlaw.org/resource/resmgr/guardian/2020_december/guardian_2020_v42n04_r6.pdf [https://perma.cc/B37Y-6PM4]. "These views are not only a product of white supremacy culture, but evidence of how grossly uneducated we are as a discipline in human trauma, systemic racism, disabilities, and cultural humility." *Id.* at 2. Inherent in the State's burden to engage the Indian family in a culturally appropriate manner is the requirement that it be cognizant of Indian families' mistrust of government actors due to centuries of abuse. *See* 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). Native communities have endured a legacy of trauma at the hands of State actors who enacted forced removal and assimilation of their children; therefore, Native families are much more likely to harbor a unique distrust of government workers. *Z.J.G.*, 196 Wn.2d at 157; *see also 1974 Senate Hearings* at 5 (statement of Byler ("The Indian family is also placed in jeopardy by the fact of going to a welfare department for help, just to get enough money to live on and money that they're entitled to under law. This exposes that family to the investigations of the welfare worker.")). Understandably, that distrust continues to permeate today, and Native families often do not trust child welfare workers. Application of the futility doctrine would only perpetuate trauma and distrust.

43

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

The application of the futility doctrine to cases involving Native families would undermine the protections afforded by ICWA and WICWA and further exacerbate the practice of separating Native families. A parent's lack of engagement is relevant only insofar as the Department's burden to prove its efforts were unsuccessful. It does not excuse the Department from providing active efforts in the first place. *See A.L.K.*, 196 Wn.2d at 696-97 (rejecting application of the invited error doctrine to an active efforts appeal when a parent was unwilling to participate in services besides visitation). If, for example, a parent's inability or unwillingness to participate in services can be a basis for the Department to stop offering any services, it would render ICWA and WICWA protections practically meaningless. State agencies and courts have both contributed to the profound loss of Native identity and community, and the futility doctrine would impermissibly alleviate the State of its responsibility on the basis of speculation. *See* Scanlon*, supra*, at 645.

Given the intent of ICWA and WICWA, the futility doctrine has no application to Indian families. Courts are "bound by the statutory language and implementing regulations of ICWA and WICWA, and we interpret these acts to serve their underlying purposes." *Z.J.G.*, 196 Wn.2d at 158. Therefore, we hold that the futility doctrine does not apply to cases governed by ICWA and WICWA.[17]

---

[17] Therefore, we overturn *D.J.S.*, 12 Wn. App. 2d at 24, 38-40, in part, because the futility doctrine is inapplicable in dependency cases involving Indian families.

44

        b.        Under WICWA, the Dependency Court Must Evaluate the Department's "Active Efforts" at Every Hearing Where the Child Is Placed out of the Home

Under ICWA, the court is required to evaluate the Department's provision of active efforts at foster care placement hearings and termination hearings. 25 U.S.C. § 1912(d). The BIA recommends the court "inquire about active efforts *at every court hearing* and *actively* monitor compliance with the active efforts requirement." BIA GUIDELINES at 43 (emphasis added). Under WICWA, the court is required to make this finding when the child is first placed out of the home, at termination, and "[i]n any dependency proceeding . . . in which the [State] is seeking the continued out-of-home placement of an Indian child." RCW 13.38.040(1)(a)(i)-(iii); *see also* 13.38.130(1). We apply the provision that offers greater protections to Indian families. 25 U.S.C. § 1921; *T.A.W.*, 186 Wn.2d at 844. Therefore, the Department bears the burden to demonstrate active efforts and the dependency court has the responsibility to evaluate those efforts at every dependency proceeding where the child is placed out of the home. RCW 13.38.040(1)(a)(ii).[18] If the Department's

---

[18] ICWA does not expressly require that the court inquire about active efforts at every hearing, but the BIA Guidelines recommend that the court make this finding at every hearing in order to actively monitor ICWA compliance. BIA GUIDELINES at 43. "This will help avoid unnecessary delays in achieving reunification with the parent, or other permanency for the child." *Id.* Again, ICWA establishes *minimum standards*. Requiring this finding only at foster placement and termination would eviscerate protections to Native families in that it would require review of active efforts only at the initiation and conclusion of dependency proceedings, but not during the course of the dependency. This would deprive the Native parent of the opportunity to benefit from services to resolve barriers to reunification. The BIA Guidelines recommend a higher standard than those required by ICWA. In order to carry out Congress' intent, courts should hold themselves

45

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

actions are not sufficient, the court must direct the Department to do more before the

case may proceed to termination.

> c.   The Dependency Court Failed Its Responsibility under ICWA and WICWA

The dependency court failed to competently evaluate the Department's

provision of active efforts and improperly applied the futility doctrine. In its oral

ruling, the court noted that referrals for family therapy, a parenting assessment, and

visitation were delayed, and it acknowledged the process could be improved, but it

failed to address the significance of the over-five-month delay. The Department's

failure to submit timely referrals did not satisfy the active efforts requirement. RCW

13.38.040(1)(a) (the Department must engage the parent "beyond simply providing

referrals"); *A.L.C.*, 8 Wn. App. 2d at 874-75 (the Department failed to make active

efforts when it did not provide a referral until 46 days after the court ordered the

service). Even though it stated that Seifert should have communicated the reasons

for not submitting the referral for family therapy, the court declined to find that this

fell below the active efforts requirement. Instead, the dependency court stated that it

"is not the court's role" to "critique how social workers could do better in every

---

and state agencies to more than the minimum standards contained in ICWA, and courts should make the active efforts finding at every hearing. This best practice, requiring the court's regular inquiry into the Department's efforts, will better improve the practice and promote the purposes of ICWA.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

case." CP at 165. That is incorrect. It is precisely the court's role to assess whether the Department meets its burden to provide active efforts.

The Department alleges that C.A. waived any opportunity to challenge the dependency court's active efforts findings because she did not directly challenge the orders from the March and June hearings that found the Department made active efforts. Both orders were agreed orders and contained a preprinted checkbox that stated:

> DCYF/Supervising agency made active efforts by actively working with the parent, parents, or Indian Custodian to engage them in remedial services and rehabilitative programs to prevent the breakup of the Indian family beyond simply providing referrals to such services, but those efforts have been unsuccessful.

CP at 2, 16. However, because the dependency court must evaluate whether the Department made active efforts on the record at every hearing where the child is in out-of-home placement, a preprinted checkbox is not dispositive and does not relieve the Department or the court of their burdens. The boilerplate language contained in the orders alone cannot meet the standard of a finding of active efforts. *See* 25 U.S.C. § 1912(d) (the State "shall satisfy the court"); RCW 13.38.130(1) (same); *see also* RCW 13.38.040(1)(a)(ii) (the State "must show to the court"). Further, counsel's signature on an order where the preprinted active efforts box is checked does not waive a parent's right to challenge the active efforts finding. Rather, as part of its duty to meaningfully evaluate the Department's efforts, the dependency court must

47

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

make a clear record of those efforts underlying such a finding. *See* 25 C.F.R. § 23.120(b) (requiring that "[a]ctive efforts must be documented in detail in the record"). The dependency court must make this finding on the record at every hearing where the child is in out-of-home placement. RCW 13.38.040(1)(a)(ii). It is important to note that the requirement of active efforts is not limited to benefiting the Indian family; it implicates the tribe's rights as well. Tribes are entitled to intervene in dependency cases involving their children and doing so makes them parties in these cases. 25 U.S.C. § 1911(c). It is as much a requirement that ensures the provision of appropriate engagement and services to the Indian family as it is a requirement that protects the rights of tribes to continue to exist and protect the next generation.

Rather than meaningfully evaluating the Department's provision of active efforts, the dependency court excused the Department's burden based on the speculative conclusion that even if the referrals had been timely made, they would have been unsuccessful. In the same way the Department faulted C.A. for the barriers to reliable communication, so did the dependency court. The court and the Department both assumed C.A. would be unresponsive and that a referral would only "set[ ] up [C.A.] for likely failure." CP at 165. The court speculated that nothing would come from the referral and stated it was "not convinced today, given the history, that anything would be different," regardless of what the Department did or

did not do. VRP (Aug. 1, 2019) at 100. The dependency court failed its duty to thoughtfully evaluate the Department's provision of efforts in compliance with ICWA and WICWA and impermissibly applied the futility doctrine.

    C.    WICWA Provides an Equal and Alternative Basis for Reversal

The plain language and purposes of ICWA and WICWA both require that the Department provide "active efforts" that are, at a minimum, thorough, timely, consistent, and culturally appropriate. ICWA itself does not provide a definition of active efforts; however, the binding federal regulations provide a detailed definition of "active efforts" along with a nonexhaustive list of examples. 25 C.F.R. § 23.2. WICWA also clearly defines what constitutes "active efforts." RCW 13.38.040(1) (defining active efforts). The definitions of "active efforts" in ICWA and WICWA are the same in that they both require the Department to engage the parent in timely, diligent, and culturally appropriate services. Therefore, while there is a sufficient basis for reversal under ICWA, there is also an equal and alternative basis for reversal under WICWA because the Department failed to meet the minimum standards for active efforts as defined in WICWA.

ICWA and WICWA also require the court to meaningfully evaluate the Department's provision of active efforts. The BIA Guidelines recommend, but do not require, the active efforts finding be made on the record at every hearing during the dependency under ICWA. However, WICWA *requires* that the dependency

49

court make this finding at every hearing where the Indian child is in out-of-home placement. RCW 13.38.040(1)(a)(ii) (requiring the Department to demonstrate to the court that it has made active efforts "[i]n any dependency proceeding . . . in which the [State] is seeking the continued out-of-home placement of an Indian child"). In this case, C.A. raised the issue of active efforts in the middle of the dependency, not during a hearing on foster care placement or termination. *Cf.* 25 U.S.C. § 1912(d). Although we conclude that the court was not required to evaluate the Department's active efforts at this stage in the dependency under ICWA, the plain language of WICWA *does* require the court to conduct this evaluation at every hearing when the child is in an out-of-home placement. RCW 13.38.040(1)(a)(ii). *But see supra* note 18. Therefore, WICWA provides an independent basis to conclude that the dependency court failed to properly evaluate the Department's efforts from January through June 2019, warranting reversal.

D.     Remedy

The remedy for improper removal of an Indian child is immediate return of the child, unless doing so "would subject the child to a substantial and immediate danger or threat of such danger." 25 U.S.C. § 1920; RCW 13.38.160 (same). This remedy is proper during the early stages of a dependency or any other stage where removal of the child may have been improper. *See A.L.K.*, 196 Wn.2d at 703-04 (reversing and remanding for a substantial and immediate danger finding when the

50

Department failed to prove active efforts at removal); *see also A.L.C.*, 8 Wn. App. 2d at 876-77 (within several months after the dependency finding, reversing and remanding for a substantial and immediate danger finding); *see also State v. Michelle P.*, 411 P.3d 576, 587 (Alaska 2018) (before returning the child to her family, remanding for a substantial and immediate danger finding when removal was ordered without any finding of such harm).

However, when the only issue is whether the Department has met the active efforts requirement during the course of an ongoing dependency, automatic reversal for a substantial and immediate danger finding is not the proper remedy. Instead, if the removal and dependency finding are not at issue, a termination petition has been filed, and the Department has not provided active efforts, the dependency court must direct the Department to provide adequate active efforts and give the parent additional time to complete services. *See* 25 U.S.C. § 1912(d) (requiring that the Department provide active efforts prior to a termination of parental rights); RCW 13.38.130 (same). A parent must have the opportunity to engage in and benefit from active efforts, and a termination petition cannot proceed until active efforts have been accomplished. This approach best balances compliance with ICWA and WICWA as well as the children's interest in permanency because automatic reversal for new proceedings when matters have already begun to proceed to termination would only further delay permanency for the children. *See In re Morris*, 491 Mich.

81, 119-20, 815 N.W.2d 62 (2012) (before invalidating all dependency orders, conditional reversal for trial court to resolve notice issue).

Here, at best, the Department provided untimely, inadequate referrals and passively engaged with C.A. This falls far short of the minimum standards in ICWA and WICWA.[19] The Department's untimely and inadequate referrals prevented C.A. from seeing her children or accessing court-ordered services for over five months. Also, the Department failed to actively engage with C.A. to help her overcome her particular needs, including communication barriers, access to treatment, and stable housing. The Department also failed to engage with C.A. and the tribe to provide culturally appropriate services. Additionally, the dependency court failed in its duty to meaningfully evaluate the Department's efforts and impermissibly applied the futility doctrine.

From January through June 2019, the Department failed in its burden to provide "active efforts" that are thorough, timely, consistent, and culturally appropriate, and the court failed to uphold the standards of ICWA and WICWA when it concluded the Department's actions were sufficient. The Department's failure impaired C.A.'s ability to engage in services to address her parental deficiencies. Before proceeding to a termination hearing, the dependency court must

---

[19] It is worth pointing out that it is unlikely that the Department's efforts would even satisfy the "reasonable efforts" requirement in non-ICWA cases.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

direct the Department to provide active efforts, and the court must give C.A. additional time to complete services with the benefit of active efforts. Therefore, we reverse the dependency court's finding that the Department satisfied the active efforts requirement, remand, and direct the trial court to order the Department to provide active efforts before the court may proceed to hear the filed termination petitions.

## III. CONCLUSION

The history of the United States and its relationship with Native tribes, communities, and families tell a story of promises made and broken. We rely on the commitment made by Congress and the Washington State Legislature to decline to remove Native children from their families and communities unless absolutely necessary and to actively work toward reunification in those limited instances when the high standard for removal has been met. Today, we hold our state child welfare system and our courts to those promises. We reverse the dependency court's finding that the Department provided active efforts and remand to the trial court with instructions to order the Department to provide active efforts in accordance with this ruling. We also order the dependency court to not proceed to hear the termination petitions until the Department has provided active efforts.

*In re Dependency of G.J.A., A.R.A., S.S.A., J.J.A., and V.A.*
No. 98554-5

Montoya-Lewis, J.

WE CONCUR:

Gonzáles, C.J.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

Whitener, J.

54