

**FILED**
**OCTOBER 20, 2022**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 38440-3-III |
| A.H., | ) | (Consolidated with |
| | ) | No. 38224-9-III; No. 38223-1-III; |
| a minor child. | ) | No. 38441-1-III; No. 38442-0-III; |
| | ) | No. 38443-8-III; No. 38225-7-III; |
| In the Matter of the Dependency of | ) | No. 38226-5-III) |
| | ) | |
| G.H., | ) | UNPUBLISHED OPINION |
| | ) | |
| a minor child. | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | |
| | ) | |
| D.H., | ) | |
| | ) | |
| a minor child. | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | |
| | ) | |
| I.H., | ) | |
| | ) | |
| a minor child. | ) | |

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

SIDDOWAY, C.J. — At issue are dependency and disposition orders for the four named children, all of whom are Indian children for purposes of the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 (ICWA) and the Washington State Indian Child Welfare Act, chapter 13.38 RCW (WICWA).[1]  Their mother appeals, challenging (1) the sufficiency of the evidence to support finding her children dependent, (2) the trial court's findings in support of continued foster care placement, and (3) a contact and reporting obligation imposed on appellate counsel by the trial court.

We affirm the dependency finding, reverse the finding of active efforts and the dispositional order's foster care placement, and direct the trial court to strike unauthorized provisions of the order of indigency.  We remand for further proceedings consistent with this opinion.

FACTS AND PROCEDURAL BACKGROUND

In April 2021, the children at issue in this appeal were taken into the custody of the Department of Children, Youth and Families (Department).  We refer to the children by pseudonyms: to A.H. as Abby, who was age six at that time; to G.H. as Garrett, then age five; to D.H. as Diana, then age three; and to I.H. as Ivy, then age two.  The

---

[1] Four of the consolidated appeals were discretionary review of the children's shelter care hearing orders, granted because the otherwise moot orders presented issues of continuing and substantial public interest.  Those issues have since been addressed by *In re Dependency of J.M.W.*, 199 Wn.2d 837, 514 P.3d 186 (2022), as described hereafter.

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

children's mother and father have lived separately since December 2018. The father visits with the children occasionally. There is no formal parenting plan in place.

In January 2021, Child Protective Services (CPS) received an intake from the Vanessa Behan center[2] that scratches and marks were observed on the back of then five-year-old Garrett, which he had not been able to explain. Shelby Yada, a CPS investigator, traveled to the home of Garrett's mother to ask about the injuries. Ms. Yada was told by Garrett's mother that the injuries resulted when a plastic bin in which her children had been playing broke. The mother's explanation was found to be plausible. Ms. Yada became aware during her investigation that the mother was experiencing difficulty with transportation and ensuring the children's attendance at school and remedial programs. She offered the mother gas vouchers, bus passes, and day care referrals. It was determined that Abby and Garrett were overdue for well-child exams, which Ms. Yada requested be completed. The mother saw that they were. The intake was closed as unfounded.

In the course of the investigation and thereafter, Ms. Yada became aware of other reports CPS had received about the family that were screened out, meaning that CPS accepted but did not act on information that did not amount to an allegation of child

---

[2] Vanessa Behan, a nonprofit organization, describes itself as "a safe, confidential place for anyone who may be experiencing a crisis and needs a helping hand." It accepts requests for childcare for children ages birth through six years of age. *See* www.vanessabehan.org/for-parents (last visited October 7, 2022).

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

abuse or neglect. One report was of a law enforcement response on March 23, 2021, to a physical and verbal altercation between the mother and the father's girlfriend, Sam (sometimes referred to as Samantha), which took place in the presence of the children. Two others were of the mother's suspected use of illegal substances. In one of those two reports, received in early March 2021, the client of a mental health provider told his or her counselor about smelling methamphetamine at the mother's home.

Ms. Yada was assigned to a second intake involving the family on April 8, 2021. The intake was again from the Vanessa Behan center, which passed along the mother's report to them that Diana had been struck in the head by the children's father on Easter, and that the father told the mother that weekend to come and get the children "or he was going to bury them." 1 Clerk's Papers (CP) at 3.[3] Ms. Yada traveled to the mother's home to see the children the next morning. The mother did not allow Ms. Yada to enter the home, but did bring the children outside to the front porch so that Ms. Yada could satisfy herself that they were there and safe. Ms. Yada did not observe any signs of injury to Diana.

---

[3] The consolidated record contains a first set of clerk's papers, report of proceedings (RP), and exhibits designated in connection with the granting of discretionary review, and a second set of clerk's papers, report of proceedings, and exhibits designated in connection with the appeal of right. The former are referred to as 1 CP, 1 RP and 1 Ex., and the latter as 2 CP, 2 RP and 2 Ex.

Ms. Yada used the opportunity to speak to the mother about the reports of possible substance abuse. Ms. Yada was carrying a kit for oral swab testing for substances and suggested that the mother provide a swab to address the concern, which the mother did. The mother also agreed to provide a UA (urinalysis) and permit a walk-through of the home the following Monday. She signed a release that allowed the Department to obtain copies of her mental health records from Ryan Townsend, a psychiatric nurse practitioner she had been seeing for medication management.

Early the following Monday, however, the mother sent a text message to Ms. Yada saying she had changed her mind about cooperating in Ms. Yada's investigation. She failed to appear for the scheduled UA. The mother would later testify that the reason for her change of heart was that during the home visit, Ms. Yada refused the mother's request that she look at bruises on the back of Diana's head. In an e-mail to Ms. Yada's supervisor, the mother said she would refuse any type of drug testing until she got a new social worker who "was willing to put my children's safety at the first and foremost." 1 Report of Proceedings (RP) at 22.

In the couple of weeks that followed, Department personnel arranged to have a family team decision meeting (FTDM). Unlike the mother, the father had not refused to engage in services and the original purpose of the FTDM was to discuss services for him.

5

It was scheduled for April 23, and the father's girlfriend, Sam, and members of the father's family were invited to participate.

Then, on April 21, Ms. Yada received the test results for the oral swab the mother had provided, and they were positive for methamphetamines and amphetamines. At around the same time, Ms. Yada had received and reviewed the mental health records from Mr. Townsend. The records revealed that the mother, who had been diagnosed with a mood disorder, had stopped taking her medication almost a year earlier against Mr. Townsend's recommendation and had not seen him since. A decision was made to include concerns about the mother as part of the FTDM. Approximately 24 hours before the FTDM was to be held, Ms. Yada hand delivered a letter to the mother inviting her to the meeting and informing her of the positive oral swab result and the Department's concerns about the mother's possible substance abuse and mental health.

The Department filed dependency petitions as to all four children on the day of the FTDM. It also moved for orders to take the children into custody and place them in shelter care. The petitions and motions were evidently filed before the FTDM, since they were supported by a declaration from Ms. Yada stating that the mother indicated she would not attend the FTDM, which "is not scheduled until 3:00 p.m." *E.g.*, 1 CP at 29,

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

49.[4] According to Ms. Yada, the mother refused to engage in the meeting "up until the meeting started," at which point "she did call in." 1 RP at 82. Ms. Yada describes the FTDM, which was held via conference call, as "very pointless" because the mother was "scream[ing] at the top of her lungs" and "[n]obody could get a word in." 2 RP at 58. The facilitator had to end the phone call because of her inability to direct participation. The mother later characterized the meeting as "a secret meeting that I was invited to last minute." 1 RP at 35. The mother agrees the meeting ended early but attributes the early ending to "my confusion of why the meeting was going on." 1 RP at 33.

The motion for shelter care alleged the children were "at significant risk of abuse and/or neglect in the care of their mother due to current substance use, numerous people coming and going from the home, and the mother's inability to follow through with the children's medical/developmental needs." *E.g.*, 1 CP at 46. Ms. Yada provided the following reasons for an emergency need to take the children into shelter care:

> Imminent risk as of today is the mom's use of methamphetamines as indicated by a recent positive oral swab, her [mental health] issues which appear to be escalating and the dad has made concerning comments via text to the bio mother indicating his desire to bury the kids and he wants to sign over his rights to her. He indicated he was trying to make her believe he no longer wanted them. There is no parenting plan that would keep the mom from coming and get her kids and we have concerns due to significant [mental health] issues and substance abuse. The dad also reported

---

[4] In almost every case, the Department filed identical submissions in each of the four dependency cases. We generally cite to only one representative filing.

> yesterday the school has been calling him due to concerns as to the mom and he is not intervening on behalf of his kids. The pattern of dad's refusal to intervene through the courts and during are [sic] intervention and coupled with significant concerns with the mom suggest these kids are at imminent risk.

*E.g.*, 1 CP at 67. The motion was granted and a shelter care hearing was set for the morning of April 26.

*Shelter care hearing*

On the afternoon of the 26th the parents appeared before a court commissioner with their lawyers for what the record indicates had been expected to be an uncontested shelter care hearing. The father agreed to a shelter care order for each child but the mother did not; she was asking that the children be placed with her. Pending the mother's contested hearing, which was continued, the court ordered the children to remain in the temporary custody of the Department, which was authorized to place them with a paternal uncle and his fiancé. Based on the father's testimony that he had Cherokee ancestry on his maternal side, the court found there was reason to know the children were Indian children and entered orders that ICWA and WICWA would apply unless and until it was determined that they were not Indian children.

Four days later, the Department filed a motion notifying the court that the paternal relatives had difficulty with the placement and asked the Department to remove the

8

children immediately. A social worker for the Department testified that the only safe placement for the children at that point was in licensed foster care.

The mother's contested hearing took place on May 6 and 10. The Department called as witnesses the mother and Ms. Yada. The mother called as a witness Janine Edelbrock, an employee at the Woodridge Elementary Head Start who was familiar with the mother through the children's participation in Head Start programs. The mother also testified further on her own behalf.

The mother acknowledged that three of her children have special needs. Abby receives therapy for speech delays, Garrett has autism and attends a school program that provides occupational and speech therapy, and the mother had scheduled an evaluation to determine if Diana also has speech delays. Ivy had exhibited no delays and was meeting her milestones.

The mother testified that she encourages the children's father to see them because the children like to see him. She acknowledged that law enforcement responded about six weeks earlier to the altercation between her and Sam. The altercation took place at the father's home during an exchange of the children. The mother insisted that the physical violence was started by Sam, who attacked her. She admitted that the children witnessed pushing and shoving and profanity between her and Sam, but testified that she

did not use profanity until Sam picked up one of the mother's daughters and held her like a shield in front of the mother's car.

The mother was presented with the test results of the oral swab Ms. Yada collected from her on April 9, but denied ever providing such a swab and claimed it could not be from her because the psychiatric medications she was taking did not show up in the results. She testified that she was prescribed benzodiazepines for PTSD.[5] She also testified that she had been diagnosed with bipolar type one, anxiety, and agoraphobia. She testified that for mental health issues she was prescribed Abilify, Ativan, and Hydroxyzine Pamoate. She denied using drugs recreationally, other than marijuana right out of high school. She admitted she had informed the Department she would not be doing anything Ms. Yada requested and wanted a new social worker.

The mother testified that what had been monthly meetings with Mr. Townsend had ended "[w]hen Covid happened," because his office stopped allowing her to bring her children to appointments and refused Telehealth. 1 RP at 67-68.

She testified that the only services she had been offered by the Department were bus passes, gas cards, and day care referrals. She testified that bus passes were of no use to her because Garrett, given his autism, would be distressed by the sights, sounds, and newness of public transportation, and with three other young children to tend to at the

---

[5] Post-traumatic stress disorder.

same time, traveling by bus was simply not feasible. She said she followed up on the day care referrals, but given limited openings and transportation problems, none of them worked out.

She was asked about a report to the Department of individuals passed out in a car in her driveway and responded that the only persons passed out in a car were in the road, and were associated with a problem drug house across the street.

Asked by the court why she would allow her children to visit their father when she described him and his family as violent, she answered that the only time he had exhibited anger toward the children was as a direct result of his anger against an adult, and "[m]ost of the time I would say that they would be safe with him." 1 RP at 40. She also stated that she had not let the father see the children "since he punched [Diana] in the back of the head." *Id.*

When examined by her lawyer, who asked her about allegations in the dependency petition that there was garbage strewn outside her home, the mother testified that it had been accumulated by the children's father and she had recently had it cleaned up. She had taken pictures of the home's current condition that were admitted as exhibits. She testified that she would be willing to work with the Department but did not feel that she had been supported in trying to keep her children in her care. She testified twice that

while she would not agree to random UAs, she would be willing to submit to a UA as part of a drug and alcohol assessment. *See* 1 RP at 30, 59.

Ms. Yada testified to her interaction with the mother in connection with the current referral and to requesting the oral swab when she visited the family on the morning of April 9. She described the information that had been received by the Department that caused her concern about possible drug use by the mother.

She testified that she did not believe the mother was addressing her mental health appropriately, based on Mr. Townsend's records indicating she had gone off her medications and ceased attending monthly appointments in June 2020.

Ms. Yada also described the mother's disruption of the FTDM. Asked about the services she had wanted to offer to the mother but "[wasn't] able to . . . at that meeting," Ms. Yada testified, "[W]e would have tried to offer random UAs, try to get her engaged in some sort of substance treatment, an in-home provider to kind of help with just the in-home chaos and clutter and any of that. Really, anything she would have been willing to do." 1 RP at 82-83. The only other services identified by Ms. Yada were gas vouchers and bus passes; she also mentioned that she tried to get the mother's car fixed for her at one point, but it was not approved.

At the conclusion of the hearing, the trial court granted the Department's motion, including making a finding that the children were in need of shelter care to prevent

imminent physical damage or harm to them. Written shelter care hearing orders were entered on May 13. The mother's trial lawyer filed notices seeking discretionary review of the shelter care hearing orders on May 17.

*Fact-finding hearing*

The cases proceeded to a fact-finding hearing on August 5, 2021. The Department called as witnesses Richard England, an expert witness on ICWA issues; Ms. Yada; Deanna Estes, who was the Department social worker assigned to the mother's case beginning in mid-May 2021; Mr. Townsend; and the mother. The mother again called Ms. Edelbrock as a witness and testified on her own behalf.

On the issue of active efforts and services being provided, Mr. England testified to the importance of the Department offering bus passes and rides. Ms. Yada testified consistent with her testimony at the shelter care hearing. Ms. Estes testified that the Department was requesting that the mother complete 60 days of random UAs without any no shows or diluted samples. She testified that the Department's position was that it would do a chemical dependency assessment if one of the UAs was positive. She acknowledged that the Department had originally asked and the mother had agreed to start with a chemical dependency assessment, but "there has not been any follow through," and "the Department is more concerned about getting the UAs in to be able to assess current use." 2 RP at 75.

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

Mr. Townsend testified that he had begun treating the mother in April 2019. He testified to adjustments he had made in her medications between then and June 2020. At the mother's appointment on June 23, 2020, she informed him she had stopped taking her Abilify. He recommended that she start taking it again and see him in a month, but she did not see him again until April 27, 2021. At that point, he had been terminating some of his patient relationships since he was reducing his workload to part-time. Since he had not seen the mother in almost a year, he informed her she would need to find another provider. He recommended that she try Frontier Behavioral Health, Excelsior or the WSU Teaching and Learning Clinic, and provided her with a 30-day refill of her Abilify "because I knew it was a struggle to get in," adding that "Right now, there's just not a lot of mental health services available." 2 RP at 91.

The mother again testified that the main reason she stopped making appointments with Mr. Townsend was because he was no longer doing video appointments and she was no longer permitted to bring her children with her to appointments. (Mr. Townsend agreed that the mother brought three or four of her children to some of her appointments in 2019 and early 2020.) Asked by her lawyer if she had any appointments for continuing medication management, the mother testified:

> A.     I do not. I've been trying to get a hold of any place other than Frontier to see if they have any openings. And most of the places that I find aren't taking either—don't take Medicaid anymore or they aren't psychiatrists or psychologists. They're just counselors or—and I had

14

forgotten—I lost the papers with the referrals and I had gotten the name Excelsior. So I'll be calling them as soon as we're done here.

Q.      Do you feel a need for ongoing medication management? Or is that a service where you feel like you need to continue to engage in?

A.      Yeah. I definitely feel better on the meds.

2 RP at 154.

On the issue of active efforts, Ms. Edelbrock was asked whether she had ever talked to the mother about difficulties she was having getting her children to the Head Start programs. She testified that she had, and she was aware the mother was trying to find childcare. She was also aware of the mother's transportation issues and testified that while she could offer bus passes, she knew that bus transportation was "not real reasonable" or "feasible" given the mother's situation. 2 RP at 115.

At the conclusion of the hearing, the trial court delivered an oral ruling in favor of the Department. Written orders of dependency, including disposition orders, were entered on September 7, 2021. The mother timely appealed. Our commissioner granted discretionary review of the shelter care hearing orders on the active efforts issue on November 23, 2021, and ordered all eight matters consolidated.

## ANALYSIS

The principal issues presented in this appeal arise under ICWA and WICWA.

Congress enacted ICWA in 1978 "in response to a lengthy and concerted effort by tribal leaders who sought to end the wholesale removal of Indian children from their

families by state and private agencies." *In re Dependency of Z.J.G.*, 196 Wn.2d 152, 164, 471 P.3d 853 (2020) (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989)). In state courts, ICWA establishes "minimum Federal standards" governing "child custody proceeding[s]" involving an "Indian child." 25 U.S.C. §§ 1902, 1903(1), 1903(4). As relevant here, its "active efforts" provision requires any party in a State court who is seeking to effect an involuntary "foster care placement" of an Indian child to satisfy the court that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). A party seeking to effect foster care placement must also obtain a determination, supported by clear and convincing evidence, that continued custody of the child is "likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e). These requirements protect even non-Native parents of Indian children, such as the mother in this case. *In re Adoption of T.A.W.*, 186 Wn.2d 828, 847, 383 P.3d 492 (2016).

In 2011, the Washington Legislature enacted WICWA, finding that Washington State is committed to protecting tribal relations and the best interests of Indian children by "promoting practices to prevent out-of-home placement of Indian children that is inconsistent with the rights of the parents, the health, safety, or welfare of the children, or the interests of their tribe." RCW 13.38.030. WICWA "is meant to strengthen

Washington's enforcement of the fundamental protections that ICWA guarantees to an Indian child, their parents, and their tribe(s)." *Z.J.G.*, 196 Wn.2d at 171. WICWA contains its own "active efforts" requirement, requiring the Department in a case like this to make "timely and diligent efforts to provide or procure" services, subject to certain minimums, including that active efforts must go "beyond simply providing referrals to such services." RCW 13.38.040(1).

WICWA also provides, however, that "nothing shall be construed to prevent the department or law enforcement from the emergency removal of an Indian child . . . to prevent imminent *physical damage or harm* to the child." RCW 13.38.140(1) (emphasis added). RCW 13.38.140 goes on to provide that emergency removal or placement of an Indian child "terminates immediately when such removal or placement is no longer necessary to prevent imminent *physical damage or harm* to the child." RCW 13.38.140(2) (emphasis added).

Washington courts treat the parallel provisions of ICWA and WICWA as coextensive unless they differ, in which case whichever "law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child . . . shall apply." 25 U.S.C. § 1921; *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 872-73, 439 P.3d 694 (2019). The statutes must be " 'construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.' " *Z.J.G.*, 196 Wn.2d at 163-64

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

(quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S. Ct. 2399, 85 L. Ed. 2d 753 (1985)).

I.     THE WASHINGTON SUPREME COURT HAS RESOLVED THE ISSUES ON WHICH DISCRETIONARY REVIEW WAS GRANTED

Our commissioner granted discretionary review of the mother's interlocutory challenge that it was error for the trial court to order shelter care where the Department had not engaged in active efforts to prevent the breakup of the family. The Department responded that the obligation to provide active efforts did not apply at the emergency removal/shelter care stage, and also that dependency and disposition orders entered four months later rendered any error in the shelter care orders moot. While our commissioner agreed that the mother's challenges to the shelter care orders were technically moot,[6] she held that the "active efforts" issue, at a minimum, presented an issue of substantial and

_____

[6] As to Abby and her siblings, the operative orders at the time of the motion for discretionary review were the orders of dependency, including their disposition orders. The orders of dependency found that as of the fact-finding hearing, the Department had made the required active efforts; clear, cogent and convincing evidence established that continued custody of the children by the mother was likely to result in serious emotional or physical damage to them; it was then contrary to the children's welfare to return home; and they should remain in the custody of the Department, to be placed or remain in licensed care.

Those orders could be, and are, challenged. But following those findings and orders, it was no longer possible to provide effective relief for any error in entry of the shelter care orders. *See In re Det. of M.K.*, 168 Wn. App. 621, 625, 279 P.3d 897 (2012) (an appeal is moot where the court can no longer provide effective relief).

18

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III,
38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

continuing public interest that, if not addressed, would escape review. Cmmr's Ruling, No. 38440-3-III, at 6-7 (Wash. Ct. App. Nov. 23, 2021).

For the same reason, the Washington Supreme Court granted discretionary review of these issues in *In re Dependency of J.M.W.*, which it decided on July 21, 2022. In that case, after investigating an initial report of physical abuse committed against eight-year-old J.M.W. by his mother, the Department received a subsequent report from the child's day care that J.M.W. arrived in pain and with bruises on his face and torso. *In re Dependency of J.M.W.*, 199 Wn.2d 837, 841, 514 P.3d 186 (2022). J.M.W., an Indian child, was thereafter taken into protective custody. *Id.* at 842. The next day, a Department social worker met with J.M.W.'s father, who asked to have his son placed with him. *Id.* Instead of pursuing placement with the father, the Department filed a dependency petition. *Id*. at 843.

At the initial emergency shelter care hearing, the father argued the State failed to make active efforts to prevent his son from being placed into foster care. *Id.* The court entered findings relating only to the Department's "reasonable efforts." *Id.* At a second shelter care hearing, the father again argued that the State failed to make active efforts. *Id*. The trial court disagreed that "active" rather than "reasonable" efforts were required, but found that if active efforts were required, the Department's efforts sufficed. *Id.*

19

While the case was on review, J.M.W. was returned to his mother, "likely mooting the case" according to the Supreme Court, which nonetheless accepted review of issues "regarding the proper legal standards that . . . can easily evade review." *Id*. at 844. It took the case to decide two questions:

> First, whether the department is required to make active efforts to keep an Indian child with their family under such circumstances as presented here. Second, whether the trial court was required to make a formal finding at the interim shelter care hearing that continued placement out of the home was necessary to prevent imminent physical damage or harm to the child.

*Id*. at 844-45.

In a five-member majority and four-member dissenting opinions, the justices parted ways over whether WICWA differentiates between emergency proceedings and child custody proceedings, and whether at shelter care hearings—Washington's emergency proceeding—the Department is required to demonstrate that active efforts were made to avoid breaking up the family. The majority conceded that under *federal regulations*, the Department was not required to take active efforts before removing J.M.W. from his mother's home, but construed WICWA as providing stronger protection for families. *Id.* at 847 n.3.

In the majority opinion, the court cited its statement in *In re Dependency of G.J.A.* that WICWA requires a dependency court to evaluate whether active efforts have been taken "'at every hearing when the Indian child is placed out of the home.'" *Id.* at 845

20

(quoting *G.J.A.*, 197 Wn.2d 868, 875, 489 P.3d 631 (2021)).  Although recognizing that

WICWA's discussion of active efforts in the context of foster care placements "are not

models of clarity," the court concluded that shelter care hearings are child custody

hearings under RCW 13.38.040(3) and foster care placements under RCW

13.38.040(1)(a) and (3)(a), and, "read as a whole," WICWA requires active efforts in

foster care placements.  *J.M.W.*, 199 Wn.2d at 847.

The court nevertheless construed WICWA as allowing law enforcement and the

Department to take children into protective custody under some emergency

circumstances where prior active efforts are not possible or required.  *Id*. at 847-48.  In

J.M.W.'s case, however, it held that active efforts *were* required, explaining:

> Where, as here, the department had prior contact with the family and reason
> to believe the child was at risk of physical damage or harm, it had an
> obligation to at least begin active efforts to avoid breaking up the family.

*Id*. at 848.  It held that on those facts, the trial court had a corresponding "obligation to

consider whether active efforts had been taken at [the two] shelter care hearings."  *Id.*

Elsewhere, the court held that proof of active efforts will not be required at all shelter

care hearings, but that "when the department has reason to know a Native child is at risk

of needing to be removed from their home for their own safety, it has an obligation to at

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

least begin to take efforts to avoid removing the child from their family's care." *Id.* at 848, n.5.[7]

Since the Department had not established it had made active efforts at either shelter care hearing, the court held that J.M.W. should presumptively have been returned to his parents. It held that at both hearings, the trial court was required by RCW 13.38.140(2) to find whether removal or placement remained necessary to prevent imminent physical damage or harm to the child. If not, the trial court should have ordered the child's immediate return to the family. *Id.* at 849-50.

Given the resolution of these issues by the Supreme Court, the public interest exception to the mootness doctrine no longer applies. We no longer have any reason to address the issues on which we granted discretionary review.

II.     WE AFFIRM IN PART AND REVERSE IN PART THE DEPENDENCY, DISPOSITION AND INDIGENCY ORDERS

The mother's appeal of the four orders of dependency raises four issues. She first challenges the sufficiency of the evidence to support finding her children dependent under RCW 13.34.030(6)(c). Alternatively, she contends that in ordering involuntary

---

[7] The dissenting justices agreed that once the Department has reason to know that a child whose safety is imminently threatened is a Native child, it has an obligation to at least begin to take efforts to avoid removing the child from the family's care, but found that obligation to be contained within the "reasonable efforts" requirement applied to emergency removals. In the dissenters' view, consistent with ICWA, active efforts are encouraged but never required as prerequisites to emergency removal. *J.M.W.*, 199 Wn.2d at 862 & n.6 (Stephens, J., dissenting).

foster placement of the children, the trial court erred in finding that (1) the Department made the required active efforts and (2) the mother's continued custody of the children was shown to likely result in serious emotional or physical damage to them. Finally, she challenges a contact and reporting obligation imposed by the trial court's order granting the mother the right to appellate review at public expense. We address the issues in turn.

A.      Sufficient evidence supports the finding of dependency

Parents have a fundamental constitutional right to the care, custody, and companionship of their minor child. *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980); *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). The State has an interest in protecting the physical, mental, and emotional health of children, however, and "when a child's physical or mental health is seriously jeopardized by parental deficiencies, 'the State has a parens patriae right and responsibility to intervene to protect the child.'" *Schermer*, 161 Wn.2d at 941 (quoting *Sumey*, 94 Wn.2d at 762).

A judicial declaration that a child is "'dependent'" will transfer legal custody of the child to the State. *Id.* at 942. The Department alleged that Abby and her siblings were dependent because they "ha[d] no parent . . . capable of adequately caring for [them], such that [they were] in circumstances which constitute[d] a danger of substantial damage to [their] psychological or physical development." RCW 13.34.030(6)(c).

In support of its ultimate finding that the mother was not capable of caring for her children within the meaning of RCW 13.34.030(6)(c), the trial court made the following findings, among others:

- Three of the children have special needs, in that Garrett is autistic, Abby has an individualized education plan for speech delays, and Diana was being assessed for speech delays;

- There are viable concerns that the mother has a chemical dependency. The court is "convinced" the mother provided the oral swab that tested positive for methamphetamine and amphetamine, and her no-showing for a UA to which she had agreed is further evidence of a chemical dependency;

- There are viable concerns about the mother's mental health, as exemplified by, e.g.

  - Mr. Townsend's testimony to his diagnosis, treatment and concerns;

  - The mother's testimony about other diagnoses she has received;

  - There is a documented one-year lapse in the mother's mental health treatment between 2020 and 2021;

  - The mother persists in believing that her report about Diana being hit by her father was not properly investigated, yet it was;

  - The mother persists in frequent allegations that her children are being abused and neglected in foster care, despite any credible evidence in support;

  - The mother has unbelievably denied that she provided the well-documented oral swab that tested positive for methamphetamine and amphetamine; and

- Ms. Edelbrock testified about the mother's decreasing contact and involvement with the children's Head Start programs and about the children's diminished attendance up until the time they were removed from the mother's care.

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

2 CP at 446-48.[8]

In the view of the trial court, the "most important and most telling" evidence that the mother was incapable of caring for her children was her own testimony. 2 CP at 449. It described the mother as "combative and hostile," with a "perception of facts [that] was often contradictory." *Id.* It found it "difficult for the court to place any credibility" in the mother's testimony, providing examples of the mother's reasoning about her own

---

[8] We omit some court findings that were based on Department employees' reports of information gleaned from records of prior intakes. In proceedings below, testimony recounting that information was objected to as hearsay, with the Department responding that its employee was testifying as an expert, presumably relying on ER 703 and/or 705 as a basis for disclosing "underlying facts or data." But " " " "[I]t does not follow [from ER 703] that [an expert] witness may simply report [underlying] matters to the trier of fact: The Rule was not designed to enable a witness to summarize and reiterate all manner of inadmissible evidence.' " " " *In re Det. of Marshall*, 156 Wn.2d 150, 162, 125 P.3d 111 (2005) (quoting *State v. DeVries*, 149 Wn.2d 842, 848 n.2, 72 P.3d 748 (2003) (quoting *State v. Martinez*, 78 Wn. App. 870, 880, 899 P.2d 1302 (1995) (quoting 3 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE § 389, at 663 (1979)))). When evidence of such "underlying facts or data" is admitted, it is not substantive evidence. *Martinez*, 78 Wn. App. at 879. It should not be treated as substantive evidence in the court findings.

The trial court also observed, and repeats in its order, that "[t]he court may consider a parent's prior law enforcement and [Department of Children, Youth and Families] history," 2 CP at 447, presumably referring to language added to RCW 13.34.110(2) in 2007. But that statute provides that the history may be considered for particularly identified purposes that arguably must be harmonized with the rules of evidence. As RCW 13.34.110(1) provides, "[t]he rules of evidence shall apply at the fact-finding hearing." We do not decide the issue, which is not briefed, but we question whether the statutory language creates an exception to the evidence rules. *Cf. State v. Gresham*, 173 Wn.2d 405, 428-32, 269 P.3d 207 (2012) (statutory enactment that evidence was admissible "notwithstanding Evidence Rule 404(b)" was unconstitutional as violating the separation of powers doctrine).

capability as a parent that did not make sense. The court concluded that these things, "coupled with her almost complete denial about things that appear to be true without any evidence that support[ed] her position is glaring." *Id.*

Of all the findings identified above, the mother challenges only one of the court's examples of her perceptions that caused it to discount her credibility. The two statements she challenges are unsupported by the record, and we have disregarded them.[9] The remaining findings are unchallenged, and, being unchallenged, are verities on appeal. *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871, 439 P.3d 694 (2019).

For her part, the mother notes that during the time frame Ms. Edelbrock dealt with the mother and her children, including home visits, she never had any concern or reason to make a report to CPS. She points on appeal to a parenting assessment she completed in June 2021 in which she was observed to demonstrate appropriate interactions with her children and scored "low risk" in three of the five areas known to be attributable to child

---

[9] The mother challenges the following statements in finding 2.2(k) of the orders of dependency:

> She testified about her diagnoses but also her belief that the medication did not help her manage these diagnoses. She gave an example of hallucinations of stars dancing where she struggled to differentiate between reality and delusions.

Br. of Appellant at 6 (citing 2 CP at 449). In fact, the mother testified that she felt *better* on medication and indicated interest in finding a new provider. 2 RP 154. She also testified that her schizophrenic tendencies present as an "overactive imagination" which can cause some visual delusions but testified she could always distinguish reality from imagination. 2 RP at 128-30.

abuse and neglect (she was "medium risk" in the two others). 1 Ex. at 10-11. She notes her participation in 22 supervised visits with her children in her home, which Ms. Estes testified "typically . . . go fairly well." 2 RP at 123. She had missed 16 of the home visits, however. She presented evidence that she had obtained assessments and identified programs to address her children's special needs, although as the State points out, some of the mother's facilitation of her children's examinations and evaluations was the result of Department involvement.

The mother points to case law holding that "'[m]ental illness is not, in and of itself, proof that a parent is unfit or incapable,'" and, "'[t]he court must examine the relationship between the mental condition and parenting ability.'" Br. of Appellant at 52 (first alteration in original) (quoting *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005)). She concedes, however, that "'[a] parent's mental illness may support a finding of dependency when it interferes with parenting ability.'" *Id.* (quoting *Schermer*, 161 Wn.2d at 945).

A dependency hearing is a "'preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (quoting *In re Matter of A.W.*, 53 Wn. App. 22, 30, 765 P.2d 307 (1988)). A dependency determination requires a showing of parental deficiency, but not parental unfitness. *Schermer*, 161 Wn.2d at 943. The determination

27

also requires showing a danger of harm, but not proof of actual harm. *Id.* at 951. The trial court has broad discretion to evaluate the risk of harm. *Id.*

In reviewing a finding of dependency, we do not reweigh evidence or reassess witness credibility. *In re Dependency of CA.R.*, 191 Wn. App. 601, 609, 365 P.3d 186 (2015). We will affirm an order of dependency if substantial evidence supports the trial court's findings of fact and the findings support the conclusions of law. *In re Dependency of M.P.*, 76 Wn. App. 87, 90, 882 P.2d 1180 (1994); *Schermer*, 161 Wn.2d at 952. Given the preponderance standard applied in the fact-finding hearing, substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013).

The mother unquestionably has mental health issues and admitted at the fact-finding hearing that she feels better when taking medications she was not then receiving. A deterioration was demonstrated in this single mother's ability to get her four children to education and programming that was important, especially given their special needs. Also shown were escalating incidences of intense flashes of anger and misperceptions of reality. There was a basis for believing she was using methamphetamine and she was resistant to the Department's request for random UAs. Although there was conflicting

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III,
38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

evidence, a rational trier of fact could find that she was exhibiting parental deficiencies that presented a danger of harm.

      B.    <u>The record does not support the trial court's finding that the Department engaged in the required active efforts</u>

The mother next assigns error to the trial court's finding that the Department made active efforts to engage her in remedial services and rehabilitative programs to prevent the breakup of the family, and the efforts had proved unsuccessful.

The trial court provided the following basis for its finding:

> Before the filing of the dependency, the Department attempted to engage the mother in services to keep the children in the home including daycare and transportation assistance. The Department also offered an oral swab to alleviate concerns of chemical dependency. An FTDM was scheduled for 4/23/21 to try to safety plan around the mother's positive oral swab. The FTDM had to be ended early after the mother would not stop screaming over everyone. Therefore, the Department was unable to safety plan and a dependency was necessary. Since the filing of the dependency, the Department has offered the mother voluntary services but she has not engaged in them. As a result, the original reasons for removal continue to exist.

*E.g.*, 2 CP at 446 (underlining omitted).

As previously discussed, the heightened duty to provide active efforts differs from the Department's obligation in non-Native cases. 25 C.F.R. § 23.2 describes "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." For an agency like the Department, they "must involve assisting the parent . . . through the steps of a case plan

and with accessing or developing the resources necessary to satisfy the case plan." *Id.* They must be "specifically 'tailored to the facts and circumstances of the case,' and the Department must act diligently to address a parent's particular needs." *G.J.A.*, 197 Wn.2d at 892 (quoting 25 C.F.R. § 23.2). WICWA describes "active efforts" as "timely and diligent efforts to provide or procure . . . services" and explicitly provides that the efforts must go "beyond simply providing referrals to such services." RCW 13.38.040(1)(a).

We have adopted the "clear, cogent and convincing evidence" standard of proof to the Department's requirement to show active efforts. *In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 28, 456 P.3d 820 (2020). Whether the Department has satisfied the requirement is a mixed question of law and fact. *Id.* at 37 (citing *Bill S. v. Dep't of Soc. & Health Servs.*, 436 P.3d 976, 981 (Alaska 2019)). We review the underlying findings for substantial evidence, but review de novo whether those findings satisfy the requirements of ICWA. *Id.*

A controlling case presents facts very similar to this case. In *In re Dependency of A.L.K.*, 196 Wn.2d 686, 478 P.3d 63 (2020), the children of L.K., who had an extensive history with CPS, were removed from her care based on allegations of abandonment. *Id.* at 691-92. L.K. had a history of methamphetamine use and the Department repeatedly attempted to get her to complete UAs and a hair follicle test, but she refused. *Id.* at 692.

30

On several occasions, L.K. said she was unwilling to engage in any services except visitation. *Id.* at 693. There was no evidence the Department went beyond recommending services by providing referrals and help with applications and setting up appointments. *Id.*

At the dependency trial, L.K. testified that she was willing to work with the Department, but she "wanted a fair report" and she insisted that CPS's most recent report on her "was 'a complete lie.'" *Id.* She repeatedly assured the court that she no longer had a drug problem. *Id.*

The ICWA director for L.K.'s tribe testified as a qualified expert that the Department had made active efforts and L.K. did not challenge active efforts by the Department at trial. *Id.* at 694. It was only on appeal that L.K. first argued the Department failed to make the required active efforts to prevent the breakup of her family. *Id.*

The Supreme Court held that the active efforts requirement "requires *more* than just creating a case plan and handing out referrals. The Department must *affirmatively* assist the parent, and 'when a parent fails to engage satisfactorily with a caseworker, the caseworker *still must try to engage the parent.*'" *Id.* at 699 (quoting *D.J.S.*, 12 Wn. App. 2d at 33). It endorsed this court's statement in *D.J.S.* that rather than having a father

31

learn how to gain housing himself, "the Department should have taken him to the resource and helped him fill out applications." *Id.* at 700.

The Supreme Court held that a parent who does not believe she needs services does not waive the right to active efforts by the Department when she denies needing services and refuses drug testing. *Id.* at 696. And it held that a parent's declination to engage in a voluntary service prior to a finding of dependency cannot be used as evidence that the Department has engaged in active efforts for the purpose of removing children from the parent's care. *Id.* at 701. When a parent is unwilling to engage with the Department, this is relevant only insofar as it shows the Department's efforts were unsuccessful and "does not excuse the Department from providing active efforts in the first place." *G.J.A.*, 197 Wn.2d at 906. The court in *A.L.K.* noted that the social worker in L.K.'s case "did not drive L.K. to services or assist her with filling out forms or applications." 196 Wn.2d at 701.

In *A.L.K.* as in this case, the Department relied in part on services it had provided in connection with earlier interactions with a parent. While the Supreme Court did not reject the propriety of looking at the entirety of the Department's dealings with a parent, it held "this does not relieve the Department from its obligation to provided *timely* active efforts in the *current* case. Having provided active efforts in the past is not sufficient to show timeliness in the present case." *Id.* at 702.

With these principles in mind, we return to the trial court's findings in support of its ultimate finding that active efforts were made to avoid the breakup of the mother's family. The court first commented on the day care and transportation assistance that the Department provided in connection with its earlier intake in January 2021. As the Supreme Court held in *A.L.K.*, those efforts do not excuse the Department from making active efforts in connection with the current intake. Also, as testified to by the mother (and agreed by Ms. Edelbrock) bus passes were not helpful for this family. The Department did not dispute the mother's testimony that she acted on the day care referrals, which turned out not to fit her needs.

The court next commented on the oral swab offered to alleviate concerns of chemical dependency. The mother provided the oral swab. She had initially stated a refusal to participate in further drug testing unless a new social worker was provided, but by the time of the fact-finding hearing was willing to undergo a chemical dependency assessment that would include a UA.

The trial court next mentions the FTDM. While the mother's behavior in the FTDM is not excusable, she claims to have been blindsided. Giving the mother 24 hours' notice of a meeting during which Sam (with whom she'd recently had a violent confrontation) and members of the father's family would participate in a discussion of the mother's mental health and suspected chemical dependency issues proved not to be a

recipe for success. As it ultimately unfolded, no one characterizes the FTDM as something that proved helpful for the mother. Ms. Yada described it as "very pointless." 2 RP at 58. While it was an effort, it does not go far in demonstrating the required active efforts.

Finally, the trial court found that "[s]ince the filing of the dependency, the Department has offered the mother voluntary services but she has not engaged in them." 2 CP at 446 (underlining omitted). A few similarly vague statements about additional services being offered were made by witnesses during the course of the dependency proceedings, but conclusory testimony that unidentified services were offered at unidentified times will not provide support for a finding of active efforts. "It is the Department's responsibility to *clearly document its actions in the record* to enable the court to reach an informed conclusion about the Department's provision of active efforts." *G.J.A.*, 197 Wn.2d at 893 (emphasis added) (citing 25 C.F.R. § 23.120(b) and BIA[10] Guidelines at 44 ("[t]his includes . . . information regarding . . . [d]ates, persons

---

[10] Bureau of Indian Affairs.

contacted, and other details evidencing how the State agency provided active efforts").[11]

The Department's evidence of active efforts is insufficient. The only offers of services that are documented were not tailored to the mother's needs at the time. A principal need was a new medication management provider. At the fact-finding hearing, Ms. Estes admitted being aware that Mr. Townsend was no longer an option for the mother's medication management and said "[*the mother*] has yet to find a new provider for those—for that service." 2 RP at 77 (emphasis added). She testified that the Department would like to see a psychological evaluation, but "[*the mother*] would need to engage completely with a new provider" for that to be completed. *Id.* (emphasis added). No evidence was offered that the Department ever offered *any* assistance.

The mother made clear at the shelter care hearing that she was willing to undergo a drug and alcohol assessment with a UA component, and Ms. Estes acknowledged at the

---

[11] In its oral ruling at the conclusion of the fact-finding hearing, the trial court also placed reliance on Mr. England's testimony that active efforts had been demonstrated. 2 RP at 173. The Supreme Court observed in *A.L.K.* that while the trial court had relied on a tribal representative's expert opinion that active efforts had been made, the expert "seems to have applied an incorrect standard." *See* 196 Wn.2d at 702. Mr. England testified in this case that "active efforts" had been provided, but he, too, described a standard at variance with Washington case law. *See* 2 RP 26-28 (testifying, for instance, that "the parent needs to engage" and "be receptive to the support that's being provided"). 2 RP at 27. And whether a trial court's findings identifying Department efforts satisfy the "active efforts" requirements of ICWA is a question of law for the court and therefore not a proper matter for opinion testimony. *A.L.K.*, 196 Wn.2d at 697 (citing *D.J.S.*, 12 Wn. App. 2d at 37).

fact-finding hearing that "an original recommendation was for a chemical dependency assessment right away." 2 RP at 73. She said the mother had agreed to that original request and admitted, "[T]here has not been any follow through as far as that goes." 2 RP at 75. Instead, the Department demanded that the mother submit to random UAs. No explanation is offered why the original recommendation—an approach acceptable to the mother—should not have been one of the tailored active efforts designed to prevent the breakup of the family.

Under 25 U.S.C. § 1920,

> [w]here any petitioner in an Indian child custody proceeding before a State court has improperly removed the child from custody of the parent or Indian custodian or has improperly retained custody after a visit or other temporary relinquishment of custody, the court shall decline jurisdiction over such petition and shall forthwith return the child to his parent or Indian custodian *unless returning the child to his parent or custodian would subject the child to a substantial and immediate danger or threat of such danger.*

(Emphasis added.) In *A.L.K.*, the Supreme Court relied on the emphasized language and "effectively the same . . . language" in RCW 13.38.160 to hold that when an appellant successfully challenges the Department's removal of children without providing active efforts, the remedy is to vacate the disposition order's out-of-home placement and remand for a determination of whether returning the children would subject the children to substantial and immediate danger or threat of danger. *A.L.K.*, 196 Wn.2d at 703. That remedy is required in this case.

36

C.  <u>We need not address the assignment of error to the finding that the mother's continued custody of the children is likely to result in serious emotional or physical damage to them because the remedy would be the same</u>

The mother's next assignment of error is to the trial court's finding that the

mother's continued custody of the children is likely to result in serious emotional or

physical damage to them.  Like a failure to provide the required active efforts, an

erroneous finding that continued custody would result in serious emotional or physical

damage would be an improper retention of custody.  The statutory remedy under

25 U.S.C. § 1920 and RCW 13.38.160 of returning the child to his parent unless it would

subject the child to a substantial and immediate danger or threat of such danger would be

the same.  Accordingly, we need not decide whether the trial court's finding of a

likelihood of serious emotional or physical damage was erroneous.

D.  <u>The trial court erred in designating who should serve as appellate counsel and imposing a contact and reporting requirement</u>

Finally, the mother assigns error to the trial court's order of indigency, which,

while providing that a lawyer should be appointed to represent her at public expense,

provided that the appointee be "[a]n attorney from the Washington Appellate Project"

and added a handwritten requirement that the mother's appellate lawyer

> shall by Declaration report to the appellate court that s/he is having consistent contact with the mother or the court ordered representation will end.  The appellate attorney must also be able to stay informed with the status of the active Dependency case.

2 CP at 585. The mother contends that the appellate court, not the trial court, is responsible for appointing appellate counsel. She contends that no authority exists to impose such a contact and reporting requirement, which could compromise the lawyer's professional responsibility under RPC 1.6(a) to maintain confidentiality. The Department takes no position on this assignment of error.

A parent in a dependency proceeding has a statutory right to counsel "[a]t all stages of a proceeding," and "if indigent, to have counsel appointed for him or her by the court." RCW 13.34.090(2). Statutory recognition of this right to counsel followed the Washington Supreme Court's decision that a parent in dependency proceedings has a state constitutional due process right to court-appointed counsel. *In re Dependency of S.K.-P.*, 200 Wn. App. 86, 97-98, 401 P.3d 442 (2017) (citing *In re Welfare of Myricks*, 85 Wn.2d 252, 254, 533 P.2d 841 (1975), *aff'd sub nom. In re Dependency of E.H.*, 191 Wn.2d 872, 427 P.3d 587 (2018).

RAP 15.2(a) and (b) provide that a party seeking review in the Court of Appeals at public expense must move in the trial court for an order of indigency, and the trial court must determine whether the party is indigent. But RAP 15.2(g) provides that "[t]he *appellate court* shall determine questions relating to the appointment and withdrawal of counsel for an indigent party on review." (Emphasis added.) RAP Form 12, the Supreme Court-adopted order of indigency form for use by trial courts, provides in relevant part

No. 38440-3-III, consol. w/ Nos. 38224-9-III, 38223-1-III, 38441-1-III, 38442-0-III, 38443-8-III, 38225-7-III, & 38226-5-III
*In re Dependency of A.H., G.H., D.H., and I.H.*

that "[Name of indigent] is entitled to counsel for review wholly at public expense," and "The appellate court shall appoint counsel for review pursuant to RAP 15.2." (Emphasis omitted) (alteration in original). *See* www.courts.wa.gov/court_rules/pdf/RAP/APP _RAP_FORM12.pdf (last visited on Oct. 4, 2022). We appointed appellate counsel in accordance with RAP 15.2(g) without heeding the trial court's designation, and the appointee is not associated with the Washington Appellate Project. The trial court's contact and reporting requirement is inconsistent with the terms of our appointment of counsel and the trial court lacked authority to impose it.

We direct the trial court to strike the language of paragraph 6 of its order of indigency other than "Other items: An attorney shall be appointed for her."

We affirm the trial court's finding of dependency, vacate the dispositional order's foster care placement, and remand for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Lawrence-Berrey, J.

Staab, J.

39